GRAVES, Respondent, v. TRAVELERS INSURANCE COMPANY, Appellant.  [Case No. 187.]

GRAVES, Respondent, v. PAN-WESTERN LIFE INSURANCE COMPANY, Appellant.  [Case No. 188.]

GRAVES, Respondent, v. PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellant.  [Case No. 189.]

*Nos. 187–189.  Argued November 25, 1974.—Decided December 20, 1974.*
(Also reported in 224 N. W. 2d 398.)

There was a joint brief for the appellant The Travelers Insurance Company by *Campbell, Brennan, Steil & Ryan, S. C.*, attorneys, and *Tod O. Daniel*, of counsel, all of Janesville; for the appellant Pan-Western Life Insurance Company by *Wickhem, Consigny, Sedor, Andrews & Hemming* and *Gilbert D. Sedor*, all of Janesville; and for the appellant The Prudential Insurance Company of America by *Stafford, Rosenbaum, Rieser & Hansen* and *John Koeppl*, all of Madison, and oral argument by *Mr. Koeppl.*

For the respondent there was a brief by *Noll, Donovan, Bolgrien & Ruth* and *Robert J. Ruth,* all of Beloit, and oral argument by *Robert J. Ruth.*

BEILFUSS, J. Four issues are raised by the defendants:

1. Did the trial court err in instructing the jury that an accident is the sole cause of death if the accidental means would have solely caused some considerable injury had the disease or bodily condition not existed?

2. Was there credible evidence to sustain a jury finding that neither a disease nor a bodily infirmity, directly or indirectly, caused or contributed to cause the death of Andre Graves?

3. Did the trial court commit prejudicial error in admitting evidence concerning an accelerator problem nine

days before the accident and in permitting closing arguments, based upon that evidence, that a defective accelerator caused the accident?

4. Is plaintiff entitled to double costs as a matter of law?

All six policies provide in substance that the additional indemnity benefits will be paid if death of the insured occurs "as a result, directly and independently of all other causes, of bodily injuries effected solely through external, violent and accidental means" evidenced by a visible contusion or wound on the exterior of the body, except in case of drowning or internal injuries revealed by autopsy.

An exclusion in the policy issued by Travelers provides in addition:

"No benefit under this Provision will be payable if death results from or is contributed to by:
"1. Any bodily or mental infirmity or disease, even though the proximate or precipitating cause of death is accidental bodily injury."

The two policies by Northern States Life Insurance Company and assumed by defendant Pan-Western, both of which further state, under the heading "General Provisions," that:

"The Additional Insurance Benefit provided by this rider shall not be payable if the Insured's death. . . .
". . .
"B. Results directly or indirectly from any of the following causes:
". . .
"(d) Bodily or mental infirmity or illness or disease of any kind."

The action against Prudential involves three policies issued by that company. Two contain a provision to the effect that the additional indemnity shall not be available if death results:

". . . directly or indirectly from bodily or mental infirmity or disease in any form. . . ."

The third states that no additional indemnity benefits will be paid if death results:

". . . directly or indirectly from bodily or mental infirmity or disease, even though drowning or an injury contributed to the death or was the proximate or precipitating cause thereof; . . ."

Andre Graves, husband of the plaintiff, died on April 8, 1969, at the age of fifty-five. Before leaving the house that morning he prepared breakfast for his wife and himself, ate with her, and took a shower. He was in a cheerful mood and appeared to be in good health. He then left home to go to his place of employment and later to a doctor and to an auto repair shop. He was driving a 1969 Pontiac which he owned for his own use. He was in the used car business.

Nine days earlier his wife had been driving the car on I–90 when the accelerator stuck and the car jerked forward, picking up considerable speed. Mrs. Graves was able to get the car slowed down by sticking her right foot under the accelerator pedal and kicking it up. Mr. Graves was in the car at the time. It took five to ten minutes before the car finally slowed down to its normal speed. In an attempt to remedy the situation, Mr. Graves placed a block of wood under the accelerator pedal. It was removed on the morning in question because Mr. Graves was taking the car to have it repaired.

At approximately 9 a. m., Mr. Graves stopped his car for a stoplight at the intersection of Broad and State Streets in Beloit. The vehicle started to move forward at a normal speed, but when it reached the middle of the intersection it suddenly began accelerating at a high rate of speed. The car veered right, jumped the curb and continued down the sidewalk along Broad Street. It

became momentarily stuck between a utility pole and building, but the high acceleration finally forced the car through. It continued down the sidewalk, turned left across the street, jumped a median strip, struck a parked car on the other side of the street and finally crashed into the Junig Motors building on the south side of Broad Street. The tires left acceleration marks on the dry pavement from the middle of the intersection to the point of collision, a distance of 273 feet. One witness estimated that the vehicle was traveling at 50 miles per hour immediately prior to impact. There was conflicting testimony as to whether the light was red or green when the vehicle began moving into the intersection.

When police and ambulance workers arrived at the scene, they found Mr. Graves slumped over onto the front seat of the car. He had a very weak pulse and made one gasp for breath, but then became perfectly still. In removing him from the car, ambulance personnel had to free his right foot, which was stuck under the accelerator pedal. In the ambulance, the attendant noted some blood and saliva in his mouth and gave Mr. Graves a heart massage and applied the resuscitator. He responded only briefly and his heart stopped beating en route to Beloit Hospital. He was pronounced dead on arrival.

Mr. Graves had suffered multiple injuries in the crash, including compound fractures of both ankles, almost complete severance of one, a broken leg and several broken ribs. The cause of death, however, was bilateral pulmonary embolism. An embolism occurs in the vascular system, normally as a blood clot which has broken loose from the wall of a vein. In Mr. Graves' case, clots had broken loose from veins in the leg or pelvis and traveled to the right and left lung blood vessels, where they stopped the blood flow to the heart.

Mr. Graves had a history of heart problems. He had a heart attack in 1966 and suffered intermittent chest

pains thereafter. He had arteriosclerosis, was hospitalized twice in 1968 for heart problems and testing. He was taking blood thinners and nitroglycerin when chest pains occurred. He had had polio in the past and had residual atrophy and partial disuse of his right leg. His medical history also included surgery for gallbladder, hemorrhoids and hernia.

At the trial, there was substantial conflict in the expert medical testimony. The plaintiff's witness, Dr. George M. Kroncke, was a cardiovascular surgeon who had treated Mr. Graves at the University Hospitals in 1968. Dr. Kroncke testified that in his opinion, to a reasonable medical certainty, the cause of death was the "automobile accident which produced emboli which went into his [Mr. Graves'] lungs and caused his death." He testified that at the time of the crash, the trauma and the squeezing of the muscles in the legs of the deceased forced the clots loose from the vein walls, thus allowing them to be pumped to the lungs where they plugged the blood vessels. From the autopsy records, his prior knowledge of Mr. Graves' condition and other evidence, Dr. Kroncke was of the opinion that the accident occurred first, and the emboli second. He stated, however, that the clots themselves were not caused by the accident, but existed for some period of time prior thereto.

Dr. Kroncke testified that clotting is a normal process in humans, in fact necessary to stop bleeding from lacerations or other means, but stated that they are more likely to grow in legs which are not in active physical use because the muscles of the legs do not force the clots to leave the vein walls and dissolve, which is the normal process. Thus the weakness of Mr. Graves' leg muscles due to polio was a factor conducive to the development of clots, as were his operations, due to the disuse of the legs during the recovery period and his heart problem. Mr. Graves was thus more prone to clotting than the average individual and for that reason was taking anticoagulants.

On cross-examination, Dr. Kroncke acknowledged that "if it were not for the fact that Mr. Graves was predisposed to clotting and the dislodgment of those clots . . . he would still be alive. . . ." In response to questioning by the court, Dr. Kroncke stated that by a "predisposition to clotting," he meant that the patient would form more clots than normal. He further stated that normal clotting is not a disease, that there was no evidence that the deceased had any more of a clotting problem, than "any other person of a comparable age and stature," and that there is no such thing as "abnormal clotting," except in "a few very rare instances." He reiterated, however, that Mr. Graves, due to his prior medical history, "would tend to form more clots than you or I."

Two doctors testified for the defendants, Dr. Jack Manley and Dr. Jordan Frank, who performed the autopsy. Dr. Manley agreed that the cause of death was pulmonary emboli but was of the opinion, to a reasonable medical probability, that the clots broke loose before the accident and that Mr. Graves was already dead when the car went out of control. He further testified that the existence of blood clots which are larger than microscopic in size is abnormal, and would be considered a "disease or infirmity." Because of his prior medical history, the decedent was predisposed to clotting, according to Dr. Manley, and his condition was "abnormal" and a "disease or infirmity," the normal hazard of which is getting clots into the lung. Dr. Manley also stated that it was unknown whether trauma could dislodge clots, and that it was improbable that the accident caused the clots to break loose. He noted, however, that merely applying the brakes of a car could produce sufficient muscular pressure on the veins to break clots loose.

Dr. Jordan Frank, who performed the autopsy on the decedent, agreed with Dr. Manley that the pulmonary emboli occurred prior to the accident, but had no opinion as to whether Mr. Graves was alive after the crash. He

stated, however, that to a reasonable medical probability Mr. Graves would have died of pulmonary emboli and shock even absent the collision. He also testified that clotting can be a normal occurrence, depending upon the size and duration of the clots, but that Mr. Graves' clots were abnormal and his embolism was a "disease."

Question three of the special verdict inquired of the jury, "Was the accident the sole cause of death of Andre Graves?" The defendants contend the instruction given was erroneous. The instruction was as follows:

"Question Three of the special verdict is concerned with whether the automobile accident was the sole cause of the death of Andre Graves. In this regard you are instructed that a man insured may be suffering from some disease or physical condition that has weakened his resistance, yet he may be the victim of an accident which is the sole cause of his death, although death might have been less likely had he been in better physical condition.

"The question calls for a finding of fact as to whether the death of the insured, Andre Graves, resulted solely from the alleged accident of April 8, 1969, independent of all other causes. In this connection you are instructed that if a disease or bodily condition exists and an accident occurs, to constitute the accidental means the sole cause of the injury, under the policies like the one in suit, it is not necessary that the injuries or the results thereof would have been as severe as they were had the disease or bodily condition not existed; but it is sufficient if the accidental means would have solely caused some considerable injury had the disease or bodily condition not existed. But if no considerable injury at all would have resulted had the insured, Andre Graves, not been afflicted with the existing disease or condition, the accidental means cannot be considered as the sole cause of the death.

"If you are properly satisfied that the accident was the sole cause of the death, then you must answer Question No. 3 'Yes,' however, if you are satisfied from the evidence that Andre Graves sustained the pulmonary embolism prior to the time that his automobile collided with the buildings in question, then you must answer the question 'No.'"

This statement of the law is taken directly from *Stoffel v. American Family Life Ins. Co.* (1969), 41 Wis. 2d 565, 573, 164 N. W. 2d 484, where this court held that such instruction properly "gives weight to the 'reasonable expectations' of the 'average man' in interpreting 'sole cause' . . . ." *Stoffel, supra,* page 572. The court elaborated at page 573:

". . . This test draws a sharp distinction between the performance of an everyday act, involving ordinary exertion and performable by a normal person without risk or consequence of serious injury, and the doing of an act that, by itself, could solely cause considerable injury to even a normal person performing it. . . ."

The insured in *Stoffel* died as a result of a rupture of the aorta, caused by trauma incurred while the insured was attempting to lift one corner of a farm wagon. Expert medical testimony indicated that while the rupture would not have occurred absent the lifting, a condition of "cystic medionecrosis," which is a defect in the middle layer of the aorta, was a contributing factor in the rupture. The jury found that death came within the provisions of the double indemnity portion of the insured's life policy, and this court, based on the above reasoning affirmed.

The defendants contend that *Stoffel* does not apply here because of differences in the policy language. More specifically, the defendants argue that *Stoffel* involved only the following relevant policy provision:

" 'The . . . Company . . . Hereby agrees . . . that if . . . the death of the Insured shall occur as the direct result of bodily injury and independent of all other causes, effected solely through external, violent and accidental means, as evidenced by a visible contusion or wound on the exterior of the body (except in the case of drowning or internal injuries revealed by autopsy), . . .

" 'The company will pay . . . the Accidental Death Benefit . . . .' " *Stoffel, supra,* page 568.

Contrary to the claims of defendants, however, the policy in *Stoffel* did contain an exclusion, not referred to in the published opinion, but appearing in 3021 Appendices and Briefs, which provided:

"The Company shall not be liable for any benefit hereunder if the death of the Insured results directly or indirectly, or wholly or partially, from . . . (i) bodily or mental infirmity; . . . (k) any kind of disease."

The policy language in *Stoffel, supra,* is virtually identical to that of the policies under consideration here. To hold that the challenged instruction is erroneous would require that we overrule our decision in *Stoffel.* We are not persuaded to do so.[1]

The defendants contend that the trial court erred in refusing to grant their motions for nonsuit and directed verdict. The question therefore is one of sufficiency of the evidence. In ruling on both of these motions, the trial court was required to consider the evidence in the light most favorable to the plaintiff. If there was any evidence to sustain the plaintiff's cause of action, then the motions were properly denied. *Valiga v. National Food Co.* (1973), 58 Wis. 2d 232, 206 N. W. 2d 377; *Low v. Siewert* (1972), 54 Wis. 2d 251, 195 N. W. 2d 451; *Trogun v. Fruchtman* (1973), 58 Wis. 2d 569, 207 N. W. 2d 297; *Liebmann v. Busalacchi* (1971), 52 Wis. 2d 692, 191 N. W. 2d 31; *Lee v. Milwaukee Gas Light Co.* (1963), 20 Wis. 2d 333, 122 N. W. 2d 374. Similarly, the standard on review by this court is whether there is any credible evidence which, under any reasonable view, fairly admits

[1] *Herthel v. Time Ins. Co.* (1936), 221 Wis. 208, 265 N. W. 575, relied upon by the defendants was considered in *Stoffel; Cretney v. Woodmen Accident Co.* (1928), 196 Wis. 29, 219 N. W. 448, also relied upon, are both distinguishable.

of an inference that supports the jury verdict. *St. Paul Fire & Marine Ins. Co. v. Burchard* (1964), 25 Wis. 2d 288, 130 N. W. 2d 866; *Zweifel v. Milwaukee Automobile Mut. Ins. Co.* (1965), 28 Wis. 2d 249, 137 N. W. 2d 6. The determination of this issue thus depends upon the testimony of plaintiff's expert, Dr. Kroncke, since both of the other experts were of the opinion that the pulmonary emboli occurred prior to the accident.

The following are excerpts from Dr. Kroncke's testimony:

"*Q.* Now doctor, at my request and based upon the information that you have obtained from the hospital records and your own personal contact with Andre D. Graves, and as his personal physician for a period of time, did you have an opinion to a reasonable medical certainty as to the cause of death of Andre D. Graves on April 8, 1969?

". . .

"*A.* Yes, I do.

"*Q.* And what is that opinion doctor?

"*A.* I feel that he had an automobile accident which produced emboli which went to his lungs and caused his death.

". . .

"*Q.* Now doctor, . . . do you have an opinion to a reasonable medical certainty as to whether this automobile accident and resulting embolism was the sole, direct, and independent cause of the death of Andre D. Graves?

". . .

"*A.* Yes, I feel that I do, yes.

"*Q.* And what is your opinion, doctor, to a reasonable medical certainty?

"*A.* I feel that the trauma of the accident produced these emboli that went into his lungs and produced the decrease in circulation in his death.

". . .

"*Q.* So all in all Mr. Graves was an individual who was rather suspectible to the development of blood clots, is that not true?

"*A.* Yes.

"*Q.* And this fact was born out by the autopsy report which showed that he had multiple clotting throughout his entire system?

"*A.* Yes.

" . . .

"*Q.* So it would be fair to state but if it were not for the fact that Mr. Graves was predisposed to clotting and the dislodgment of these clots by—which form pulmonary emboli, he would still be alive today? He would still be alive if it were not for his predisposition to form clots which later became pulmonary emboli?

"*A.* Yes, I believe so.

" . . .

"*Q.* Was there ever any evidence, that you know of, that Mr. Graves had any more of a clotting problem than any other person of a comparable age and stature?

"*A.* No.

" . . .

"*Q.* I assume not all clotting is what you would characterize as a disease process?

"*A.* No, normal clotting is necessary.

"*Q.* Abnormal clotting would be?

"*A.* I don't think there is such a thing. There are a few very rare instances of abnormal clotting. I think most clots are normal.

" . . .

"*Q.* In Mr. Graves' situation where he had substantial periods of inactivity as a result of surgical procedures and his prior heart attack and poliomyelitis, he was more predisposed to the development of clots and having a clotting problem, is that not true?

" . . .

"*A.* Yes, I would say he would tend to form more clots than you or I."

" . . .

"*The Court:* I have got one further question. I get the impression you don't feel this coronary artery disease was a factor at all in his death.

"*The Witness:* I'm sure it was a factor in his death. . . ."

These excerpts demonstrate that Dr. Kroncke's testimony contained some internal inconsistency. Even when the same witness makes two contradictory statements,

however, it is within the province of the jury to accept and rely on either version, and to disregard in part or in toto the other. *Basche v. Vanden Heuvel* (1951), 260 Wis. 169, 175, 50 N. W. 2d 383; *Smith v. Koch* (1945), 247 Wis. 551, 554, 20 N. W. 2d 566; *State ex rel. Brajdic v. Seber* (1972), 53 Wis. 2d 446, 450, 193 N. W. 2d 43.

The jury could reasonably find that Mr. Graves' clotting was not a disease or infirmity since there was testimony that he had no more clotting than any other person of similar age and stature. Similarly, the jury was not required to find that recovery was barred because Mr. Graves was afflicted with pulmonary embolism prior to his death because Dr. Kroncke testified that such condition was caused by the accident.

From all of the plaintiff's evidence, the jury could reasonably believe that violent body trauma as evidenced by his physical injuries was a sufficient external force which dislodged the clots which, in turn, formed the emboli that caused his death. The jury could further believe from the testimony of Dr. Kroncke that Mr. Graves would not have died on the day in question or on any other given day from a pulmonary embolism. The evidence and the reasonable inferences to be drawn therefrom bring this case within the rule of *Stoffel, supra.*

As stated in *Cretney v. Woodmen Accident Co., supra,* page 32:

". . . When an accident causes a diseased condition, which together with the accident results in injury or death complained of, the accident alone is to be considered as the cause of the injury or death, . . ."

The defendants contend that the evidence regarding the acceleration problem of the vehicle was inadmissible because of its "speculative" nature, and that it was therefore error to allow plaintiff's attorney to argue to the jury that the accelerator was responsible for the accident.

The objection made to the introduction of such evidence was that it was irrelevant. The trial court quite

properly overruled the objection. Sec. 904.01 of the Wisconsin Rules of Evidence provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." See also State v. Becker (1971), 51 Wis. 2d 659, 188 N. W. 2d 449; Rausch v. Buisse (1966), 33 Wis. 2d 154, 146 N. W. 2d 801.

The testimony regarding the accelerator fulfilled the test of relevancy.

Defendants cite several cases for the proposition that a verdict may not be based on speculation. The evidence in those cases was nowhere near as persuasive as in this case. In Hyer v. Janesville (1898), 101 Wis. 371, 376, 377, 77 N. W. 729, cited by the defendants, the court stated:

". . . a jury cannot properly be allowed to determine disputed questions of fact from mere conjecture. There must be some direct evidence of the fact, or evidence tending to establish circumstances from which a jury would be warranted in saying that the inferences therefrom clearly preponderate in favor of the existence of the fact, . . ."

In the instant case, there was testimony that the car had accelerated spontaneously while Mrs. Graves was driving, and that she had to kick up from under the gas pedal to slow the car down. There was testimony that the wooden block, which was used to prevent a recurrence, was removed the day of the accident. There was testimony that the car began accelerating wildly at the time of the accident and that when Mr. Graves was removed from the car, his right foot was stuck under the gas pedal. This evidence, while undoubtedly circumstantial, certainly preponderates in favor of the contention that the faulty accelerator caused the accident, and a finding to that effect

by the jury cannot be dismissed as mere conjecture or speculation.

With respect to the propriety of reference in closing arguments to the accelerator as the cause of the accident, the defendants cite *Affett v. Milwaukee & Suburban Transport Co.* (1960), 11 Wis. 2d 604, 607, 106 N. W. 2d 274, for the proposition that "closing arguments of counsel are to be confined to facts in the evidence or to what may be properly inferred from the evidence." We believe a proper inference from the uncontroverted testimony referred to above is that the accident was caused by the faulty accelerator.

More than twenty days prior to the commencement of trial, the plaintiff served offers of settlement upon the various defendants' counsel. Plaintiff offered to settle with Travelers for $9,000, with Pan-Western for $9,000, and with Prudential for $6,250. None of these offers was accepted. Following the jury trial, the plaintiff was awarded, exclusive of costs, $10,000 against Travelers, $10,000 against Pan-Western, and $7,045 against Prudential.

Pursuant to sec. 269.02 (3), Stats., the plaintiff was awarded double costs. On motion of the defendants, however, the trial court amended the judgments so that double costs were not awarded. Plaintiff, by notice of review, seeks review of the order denying double costs.

Sec. 269.02 (3), Stats., provides:

"SETTLEMENT. After issue is joined but at least 20 days before trial, the plaintiff may serve upon the defendant a written offer of settlement for the sum, or property, or to the effect therein specified, with costs. If the defendant accepts the offer and serves notice thereof in writing, before trial and within 10 days after receipt of the offer or within 40 days after service of the notice of trial, whichever is later, he may file the offer, with proof of service of the notice of acceptance, with the clerk of court. If notice of acceptance is not given, the offer

cannot be given as evidence nor mentioned on the trial. If the offer of settlement is not accepted and the plaintiff recovers a more favorable judgment, he shall recover double the amount of the taxable costs."

There was no issue at the trial regarding the amount of damages involved. Such amounts were determined solely by reference to the insurance policies themselves. The trial court was of the opinion that the statute had no application in a situation, as here, where the damages are liquidated. While that view has considerable appeal, the statute is clear and unambiguous. It unequivocally provides that if the recovery is more favorable than the the offer, the plaintiff shall recover double costs. The purpose of the statute is to encourage pretrial settlements. Although the legislature could have limited the application of the statute to cases involving unliquidated damages, it did not do so. This court cannot adopt an interpretation of a statute which conflicts with the clear meaning of the words chosen by the legislature. *Tanck v. Clerk, Middleton Joint School Dist. No. 3* (1973), 60 Wis. 2d 294, 210 N. W. 2d 708; *Milwaukee County v. Schmidt* (1971), 52 Wis. 2d 58, 187 N. W. 2d 777; *State ex rel. Neelen v. Lucas* (1964), 24 Wis. 2d 262, 128 N. W. 2d 425.

The plaintiff is, by virtue of the statute, entitled to double costs in the trial phase of this action and ordinary costs upon the appeal.

*By the Court.*—Judgments affirmed in part and reversed in part and remanded to amend the judgments in conformity with this opinion.