UNITED STATES FIDELITY & GUARANTY COMPANY, and another, Plaintiffs-Respondents, v. FRANTL INDUSTRIES, INC., and others, Defendants and Third-Party Plaintiffs-Appellants: CRAWFORD, Third-Party Defendant-Respondent.

*No. 706 (1974). Submitted on briefs April 12, 1976.— Decided May 4, 1976.*
(Also reported in 241 N. W. 2d 421.)

480

For Frantl Industries, Inc., and Shelby Mutual Insurance Company of Shelby, Ohio, the cause was submitted on the brief of *Harold A. Dall, Terrance E. Davczyk* and *Kasdorf, Dall, Lewis & Swietlik* of Milwaukee; for Republic Powdered Metals, Inc., there was a brief by *Robert C. Watson* and *Arnold, Murray & O'Neill* of Milwaukee.

For the plaintiffs-respondents the cause was submitted on the brief of *Donald C. Fellows* and *Wolfe, O'Leary, Kenney & Wolfe* of Milwaukee.

For Theron Crawford there was a brief by *Andrew O. Riteris, Jeffrey L. Abraham* and *Michael, Best & Friedrich* of Milwaukee.

HANLEY, J. Three issues are presented on this appeal:

1. Was it error for the trial court to exclude testimony and jury instructions on the Wisconsin Administrative Code provisions on flammable liquids?

2. Did the trial court correctly restrict the special verdict inquiry on Crawford and the pipe company to whether he had ordered the welding operation?

3. Should the trial court have directed a verdict finding Republic free from negligence?

*Wisconsin Administrative Code.*

Alumanation 301 is a thick liquid composed of mineral spirits, cutback asphalt, asbestos fiber and aluminum pigment. The first two elements are petroleum derivatives, as is the solvent used in the aluminum pigment. Testimony established a derivative content of seventy-two percent. Republic apparently distributed the product in five-gallon metal containers painted black. No labelling indicated a propensity for burning. Brochures and labelling denominated it a cutback asphalt asbestos fiber coating containing aluminum pigment for use as a waterproofing and heat protecting cover. An officer of Frantl also testified that the labels proclaimed the product "fire resistant."

An expert witness for Frantl explained that materials ignite through the application of heat such that a vapor is produced and ignition follows. This level is known as the flash point. Pure compounds have discrete flash points while a product of mixed origin would have a flash point of its most flammable element. The cutback asphalt used in Alumanation 301 had flash points between 95° and 110° F., apparently depending on the production process variations involved in any particular batch.

At all times material to this action, the Wisconsin Administrative Code has defined a "flammable liquid" as a liquid having a flash point at least below 140° F. On September 1, 1971, the same day as the contract made by Frantl and the pipe company, revised rules concerning flammable liquids went into effect, including sec. IND 8.14 (3) :

"(3) No dispensing of any liquids having a flash point of less than 110° F. shall be made into portable containers or portable tanks unless that such container or tank is substantially a bright red color, bears a U.L. label or is constructed of metal having a tight closure

with screwed or spring cover, and is fitted with a spout or so designed that the contents can be poured without spilling.

"(a) No kerosene, fuel oil or similar liquids having a flash point of 110° F. or more shall be filled into any portable container or portable tank colored red."

Frantl and Shelby contend that the jury should have been enlightened, either through the admission of the proffered direct evidence or through jury instructions, as to the administrative categorizing of liquids as flammable upon a flash point under 140° F. They also argue that the expert's interpretation of the applicability of Code provisions, presumably the above-packaging requirements, should also have been admitted in evidence.

Regarding the latter argument, the trial court noted that this Code provision went into effect on September 1, 1971, and that there was no testimony that Republic had "dispensed" (initially assuming that this term includes a sale) the Alumanation 301 after this date. An employee of Frantl testified that this product had been used by them in the past, raising the implication that they maintained a stock of such coating. There was no testimony produced by Frantl that the product was ordered by them after the effective date of the Code or even that their normal work procedure included ordering materials after negotiating a contract. When this deficiency was noted by the trial court in affirming its bar of testimony on the Code, counsel for Frantl and Shelby mentioned the lack of such records by Republic and inferred that it had the responsibility for producing evidence on the nonapplication of the Code. To the extent that Frantl charges Republic with negligence and complains of error in the exclusion of evidence to that end, it assumes the burden of showing the materiality of such evidence. Failing to do so warranted the exclusion of the "red can" provision. It is not applicable to the facts adduced.

A reading of the entire administrative chapter demonstrates that "dispensing" under sec. IND 8.14 (3) was not meant to apply to sales such as made by Republic here. The specific use of "sale" in secs. IND 8.40 and 8.14 (1) proves this proposition, as does the use of "dispensed" in 8.14 (2). Manufacturers of products containing flammable fluids, other than petroleum derivatives used for fuel purposes (covered by sec. 168.11 (2) (a), Stats.,) must market their products in containers of specified design and construction with labels of their contents. Container exemptions exist for common consumer products, whose packaging is more directly controlled under sec. 100.37. Purchasers who dispense flammable liquids from the original packaging into other portable containers for the use of themselves or their employees must do so into containers that apprise of and protect from the dangers arising from heat and flame sources near such container. The clear purpose of sec. IND 8.14 (3) is to prevent mishaps involving the second-hand unmarked, neutral-colored can containing a "mysterious" liquid. No error occurred by the exclusion of this section from the attention of the jury.

A closer question exists as to the exclusion of the statutory rating of flash points used to determine "flammable" and "combustible" liquids under the Code. Those provisions existed in the Code regulations both before and after September 1971. Since there were no other particular provisions of the Code employing such terms offered into evidence, the only purpose for allowing the ratings into evidence would be to show that Alumanation 301 would be considered highly flammable. As such, the Code would be relevant to the common-law negligence theory that a reasonable man would have labelled it as such, or at least used explanatory labelling disclosing that fire and heat resisting properties occurred only after

the coating had been applied and dried such that its flammable petroleum solvent base had evaporated. Respondents cite no prejudice in such use, and it was error to thus exclude that portion of the Code.

The error, however, was harmless because expert testimony undisputedly established the liquid as flammable and requiring, in the opinion of the expert, more accurate labelling. Frantl and Shelby argue that the apportionment of negligence to Republic would increase if the jury had been aware of the Code provisions. This argument is erroneously premised on the belief that sec. IND 8.14 (3) would also be admitted. Admission of the ratings would be merely cumulative to the expert testimony. *See: Carlson v. Drews of Hales Corners, Inc.* (1970), 48 Wis. 2d 408, 419, 180 N. W. 2d 546. Doubtless it would not alter the apportionment, especially in view of the frank but damaging admission of Frantl employees that they were aware of the flammability hazard of welding so soon after applying the coating.

*Special verdict form.*

The special verdict questions concerning Crawford inquired only as to the fact of whether he ordered the welding and, if so, whether he was negligent in such order. No inquiry was made as to any other aspect of negligence on his part, either through a less limited inquiry or through additional specific questions on actions which could be viewed as negligent. Neither was any question included as to negligence of his employer, the pipe company. Frantl and Shelby cite this as error.

In support of their contention, these appellants state that the record contains much evidence upon which a jury could assess negligence against Crawford or the pipe company. They state that Crawford supplied the use of a welder without any instructions or request that

Frantl keep a fire extinguisher available; however, they also contend that the fire extinguishers that were supplied by the pipe company were inadequate. It is also contended that American Concrete posted no signs nor took safety efforts regarding the safe use of the welder. The appellants finally argue that they offered a proposed verdict which would have enabled an apportionment among all parties.

Their proposed special verdict in fact merely contained the following question:

"Was plaintiff's insured, American Concrete Pipe Company (Crawford), negligent in respect to the welding operation?"

Similarly, in its third-party complaint against Crawford, the appellants predicated his negligence, even regarding the lack of effective fire extinguishers and safety admonitions, on the fact that he "ordered and insisted" that Frantl employees proceed with the welding. The answer to the complaint of the plaintiffs, however, does contain affirmative defense allegations of contributory negligence that includes the aforementioned negligence of Crawford and the pipe company argued here as adduced on the record.

Therefore, the pleadings do raise the issue of the pipe company's own contributory negligence, which includes that of its employee servant Crawford, there being no contrary assertion that he was acting outside the scope of his agency. Some testimony on the subject was received without objection, and it cannot be claimed now that it was in variance with the pleadings or that the other parties were misled to their prejudice.

The proposed verdict of Frantl and Shelby would therefore be proper if there was evidence adduced at trial in support of such theories of negligence. If the evidence

supports two theories of liability, acceptance of a verdict covering either has been allowed. *Krudwig v. Koepke* (1936), 223 Wis. 244, 270 N. W. 79. Likewise, if the evidence is in conflict and inconsistent theories are advanced to explain the occurrence, instructions encompassing both theories should be given. *Aetna Cas. & Sur. Co. v. Osborne-McM. E. Co.* (1965), 26 Wis. 2d 292, 305, 132 N. W. 2d 510.

A review of the record must be made to determine whether there is evidentiary support for the argued instances of general negligence on the part of the pipe company. This review must also reveal a proper theory upon which contributory negligence, as generally asserted in the appellants' answer, can be charged. It is undisputed on the record that Frantl Industries is an independent contractor. The Restatement, *Torts* 2d, secs. 410–415 list occasions where the employer may be liable for his own negligence, even if the work entrusted to the contractor is such that the employer is not otherwise answerable for the negligence of the contractor which consists of the improper manner in which the contractor and his employees perform the operative details of the project. Ordering certain performances or retaining control of certain aspects of a project are sources of employer negligence. Restatement, *Torts* 2d, secs. 410 and 414. Failure to exercise reasonable care to provide for the taking of such precautions, either by the contractor or otherwise, as in advance are recognizable as necessary for safe performance, is another. *Mueller v. Luther* (1966), 31 Wis. 2d 220, 142 N. W. 2d 848. This negligence may be an offset to recovery as contributory negligence when the injury is to the employer's property rather than a third party.

Here, in effect, a verdict was directed against appellants on the question of contributory negligence other

than in the factual situation of whether the contractor was ordered to do the welding. This would be proper only if the record, considered in the light most favorable to the defendants, contained evidence to sustain a valid theory of contributory negligence. *See: Graves v. Travelers Ins. Co.* (1974), 66 Wis. 2d 124, 134, 224 N. W. 2d 398. Such evidence must not be merely conjectural or incredible. *Jagmin v. Simonds Abrasive Co.* (1973), 61 Wis. 2d 60, 66, 211 N. W. 2d 810. Also, even if facts lend support to the alleged theory of a duty of care, the court, as in cases of summary judgment, may still decide as a matter of law that the duty does not exist. *See: Schicker v. Leick* (1968), 40 Wis. 2d 295, 299, 300, 162 N. W. 2d 66.

Considering these standards, was the absence of an inquiry into the pipe company's own negligence proper?

*Supply of welder without instructions or request that fire extinguishers be available when the welder was being used.* The testimony established that the pipe company permitted the use of its welding equipment throughout the project by Frantl Industries as a convenience to them. It is not the source, but rather the fact that welders were anticipated as necessary for the work, which predicates this duty, if any. Use of welders hardly is a type of work likely to create a peculiar unreasonable risk for which the employer has a duty to instruct the independent contractor on special precautions for their use. See comment *b,* Restatement, *Torts* 2d, sec. 413.

*Neither Crawford nor the pipe company asked Frantl Industries to use fire resistant coatings.* Choice of materials for the project could be an area of retained control by the employer where his negligence demands liability. The record, however, is barren of any evidence supporting this theory. Testimony of Crawford did indicate that he did not request fire resistant coatings, but

the testimony further indicates that he merely had some input in the contract process. There is no testimony that the pipe company specified anything in regard to flammability of coatings, or that nonflammable coatings existed which could have been used. Testimony of one of the Frantls indicated a belief that the coating was labelled "fire resistant." While the theory as alleged here is sound in the abstract, the evidentiary basis is fatally speculative.

*Available fire extinguishers were inadequate.* Again, the evidentiary foundation for the theory is not sound. In support of this theory, the appellants cite the testimony of Gary Frantl, who described how he could not direct the spray of the extinguisher to the fire behind the doors. Crawford testified that there were between eight to ten extinguishers, of different sizes, available at the plant. The testimony that the particular undescribed extinguisher chosen as the "handiest" by the Frantl employee, who stood by to watch for fire, was ineffective under the circumstances, is a wholly conjectural basis for allowing a verdict inquiry on the pipe company's equipment. Although the sufficiency and weight of testimony is a question for the trier of fact, *Luke v. Northwestern Nat. Casualty Co.* (1966), 31 Wis. 2d 530, 535, 143 N. W. 2d 482, speculation and conjecture:

". . . apply to a choice between liability and nonliability when there is no reasonable basis in the evidence upon which a choice of liability can be made." *Id.* at page 536.

We hold that the trial court committed no error in restricting the inquiry to the sole question of whether Crawford ordered the Frantl employees to weld, which would compose a basis for his employer's contributory negligence.

*Superseding negligence.*

At the close of the trial, Republic moved for a directed verdict absolving it from liability. This denied motion was premised on a lack of causality of the harm in the face of testimony by Frantl Industries employees that they were aware of a fire danger. Republic had requested here that the judgment be reversed as to it because the record discloses that the negligence of the employees of Frantl Industries was a superseding factor relieving Republic of liability.

In *McFee v. Harker* (1952), 261 Wis. 213, 219, 52 N. W. 2d 381, this court adopted the standards of Restatement, *Torts* 2d, sec. 447 for determining whether an intervening act of negligence supersedes the preceding negligence of another:

"The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if

"(a) the actor at the time of his negligent conduct should have realized that a third person might so act, or

"(b) a reasonable man knowing the situation existing when the act of the third person had so acted, or

"(c) the intervening act is a normal response to a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent."

The proper procedure for raising the defense of a superseding cause was detailed in *Ryan v. Cameron* (1955), 270 Wis. 325, 331, 71 N. W. 2d 408. It is a question of law for the trial court to decide *after* the verdict has determined that the first actor's negligence was a substantial factor in causing harm. *Strahlendorf v. Walgreen Co.* (1962), 16 Wis. 2d 421, 430, 114 N. W. 2d 823; *Merlino v. Mutual Service Casualty Ins. Co.* (1964), 23 Wis. 2d 571, 580, 127 N. W. 2d 741. There is no indi-

cation that such postverdict request was made for the trial court to pass upon.

There is an even more compelling reason for this court not to alter the verdict. The three criteria of the Restatement are in the alternative, and it has been held that the intervening act does not constitute a superseding cause which precludes the negligence of the first actor from being a legal cause of the harm if facts fall within any one of the three tests. *Dombrowski v. Albrent Freight & Storage Corp.* (1953), 264 Wis. 440, 446, 59 N. W. 2d 465. Although there was testimony by the employees of Frantl that they were aware of a danger in welding near fresh paint or coatings, it is clear that they were unaware of the particular high flammability potential. George Frantl mentioned the asbestos labelling, as did Allan Frantl, in considering the danger of welding. George Frantl also testified that he thought that the coating might merely "puff" like some materials do when ignited. Thus, the failure to clarify that the solvent base in the undried mixture was highly flammable despite the presence of heat resisting materials such as asbestos certainly categorizes the commencement of welding here as a normal consequence of the situation created by Republic's conduct in not adequately labelling the Alumanation 301 and as not extraordinarily negligent. Republic's arguments here on its qualification under the first two Restatement standards is not dispositive, although undoubtedly it was considered by the jury in apportioning causal negligence between Frantl Industries and Republic. We conclude that it cannot be stated as a matter of law that the welding was a superseding cause here in light of the third Restatement standard.

*By the Court.*—Judgments affirmed.