Chad ERICKSON, a minor, by his guardian ad litem, Arnold J. Wightman, Barbara Erickson, and David Erickson, Plaintiffs

v.

A. Erik GUNDERSEN, M.D., Robert G. Shurtleff, M.D., Defendants,

The GUNDERSEN CLINIC, LTD., Defendant-Respondent,

WISCONSIN PATIENTS COMPENSATION FUND, Defendant-Appellant.

Court of Appeals

*No. 93–1015. Submitted on briefs February 2, 1994.—Decided March 10, 1994.*

(Also reported in 515 N.W.2d 293.)

For the defendant-appellant the cause was submitted on the briefs of *Jeffrey J. Kassel* of *LaFollette & Sinykin* of Madison and *James M. Fergal* of *Schellinger & Doyle, S.C.,* of Brookfield.

For the defendant-respondent the cause was submitted on the brief of *Robert D. Johns, Jr.,* of *Johns & Flaherty, S.C.,* of La Crosse.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

EICH, C.J. We are asked in this case to decide several issues arising out of a cross-claim filed by the Gundersen Clinic against the Wisconsin Patients Compensation Fund, both of whom were parties to a medical malpractice action commenced on behalf of Chad Erickson, who was severely injured while undergoing surgery at the Clinic.

## I. Issues and Decision

Some background is necessary. Section 655.23(4), STATS., requires health care providers to carry primary liability coverage of at least $400,000 for each occurrence, or to be responsible for that amount under a self-insurance plan. Under the statutory scheme, the Patients Compensation Fund, to which all providers pay annual assessments, provides excess coverage over $400,000. If a malpractice claim arises in which it appears reasonably probable that the provider may be liable for an amount exceeding $400,000, the Fund is authorized to negotiate an agreement with the provider or its insurer to assume defense of the action and pay all excess liability, in exchange for a tender of the underlying policy limits, or $400,000, whichever is greater. *See Continental Casualty Co. v. Wisconsin Patients Compensation Fund*, 164 Wis. 2d 110, 114, 473 N.W.2d 584, 585 (Ct. App. 1991).

The dispute in this case concerns such an agreement between the Gundersen Clinic and the Fund with respect to Chad Erickson's malpractice claim against two physicians and certain nonphysician medical technicians, all of whom were employed by the Clinic. When it became apparent that Erickson's damages would exceed $400,000, the Clinic tendered $400,000 to the Fund in exchange for the Fund's agreement to assume the defense of the Clinic and its employees.

The Fund, however, claims that it was unaware at the time that the two physicians were Clinic employees. It asserts that it mistakenly entered into the agreement, believing that it would be indemnifying only the Clinic's nonphysician employees and that, if the agreement is held to cover the physicians as well, the Fund should have received an additional $800,000

from the Clinic. It seeks to rescind the agreement for that reason.

The trial court granted summary judgment to the Clinic, ruling that the Fund accepted the $400,000 as an accord and satisfaction of the parties' dispute over the extent of the Clinic's responsibilities and rejecting the Fund's argument that the agreement should be rescinded on grounds of "mistake."

The Fund challenges these rulings on appeal. It also argues that the court improperly "stacked" its award of interest to the Clinic by adding the twelve percent interest provided by statute in cases where an offer of settlement is rejected (and the prevailing party recovers judgment in an equal or greater amount) to the common-law interest of five percent applicable in cases where damages are either liquidated or readily determinable prior to trial.

While we disagree with the trial court's ruling that the Clinic's payment to the Fund was an accord and satisfaction, we conclude: the parties' letters constituted their agreement; the Fund is not entitled to rescission of that agreement on grounds of mistake; and the trial court properly granted summary judgment to the Clinic. We also conclude, however, that the court erroneously calculated prejudgment interest. We therefore affirm in part, reverse in part and remand to the circuit court to recalculate the interest.

## II. Facts

In 1989, Chad Erickson, a minor, underwent heart surgery at Lutheran Hospital in La Crosse. The surgeons performing the operation, Dr. A. Erik Gundersen, a thoracic surgeon, and Dr. Robert Shurtleff, an anesthesiologist, were both employees of the Gundersen Clinic.

110

Tragically, the cardiopulmonary bypass machine that was to provide oxygenated blood to Chad's body during the surgery was improperly attached, resulting in insufficient oxygen reaching his brain for a substantial period of time. As a result, he suffered severe and irreversible brain damage. The machine was set up and operated by two nonphysician medical technicians who were also employees of the Clinic.

After the nature of the incident became known to the Clinic, its attorney contacted the Fund about the possibility of tendering the defense of the anticipated malpractice action to the Fund. The Clinic's attorney spoke with John Nenarella, a claims specialist assigned to investigate the Erickson matter. A second conversation on the subject took place approximately two months later between the Clinic's attorney and Gerald Peura, Nenarella's supervisor. Three days after this conversation, Peura spoke to the Clinic's comptroller, Daryl Applebury, regarding the tender of the defense. Immediately following that conversation, Peura wrote to Applebury, stating:

> You indicated that your Board . . . would issue a draft in the amount of $400,000 to the . . . Fund in exchange for the . . . Fund providing all future defense costs and investigative steps to bring this case to a conclusion. We agree with you and the purpose of this letter is to confirm that understanding.
>
> . . . .
>
> The Fund will assume all expenses, investigative costs and efforts from the point [of] receipt [of a draft for $400,000] until this case is closed.

Upon receiving the letter, Applebury immediately responded by facsimile:

Thank you for the quick response to our request for a letter explaining the . . . Fund's acceptance of all expenses including further *defense costs, investigative costs* and *final settlement costs* related to this case in return for our check . . . in the amount of $400,000 . . . .

It is our understanding that the $400,000 is the *only payment* that will be required to be made from the Gundersen Clinic . . . in connection with current and future claims arising out of the Chad Erickson incident.

(Emphasis in original.) Applebury sent the Fund a check for $400,000 on the same day.

Other than a "confirming" letter from Nenarella to Applebury approximately two weeks later,[1] there were no further dealings between the Clinic and the Fund over the next several months.

Then, after Chad Erickson and his parents commenced an action against the Clinic and Drs. Gundersen and Shurtleff (and other Lutheran Hospital physicians and the Fund), the Clinic's attorney tendered the defense of the Clinic and the physicians to

---

[1] Nenarella, who had been out of town on the date of the telephone conversation between Applebury and Peura (and the exchange of facsimile transmissions), wrote to Applebury on his return to the office on September 5, 1989, confirming that the $400,000 payment constituted "the only payment that will be required to be made from the . . . Clinic . . . arising out of any acts by employees of the . . . Clinic," and noting that if there were "independent acts of negligence" by other physicians in the Erickson matter, the Fund would "seek contribution from them as well."

While we do not believe that this letter modified or added to the agreement set forth in the earlier correspondence, it is referred to in the Fund's argument discussed in part VI of this opinion and we address it there.

112

the Fund. Nenarella accepted the tender of the Clinic's defense, but not that of the physicians.

The Clinic then cross-claimed against the Fund, asserting that the Fund was bound by its agreement to accept the defense of all Clinic employees, including the two physicians. The cross-claim alleged that a "dispute arose" regarding "the clinic's liability exposure" under ch. 655, STATS., prior to Applebury's and Peura's exchange of correspondence and the tender of $400,000, and that the Fund's acceptance of the check amounted to an accord and satisfaction, thus binding the Fund to its agreement. According to the Clinic, the "dispute" centered on whether its payment covered the defense of all Clinic employees—physicians and non-physicians alike—or whether it applied only to the nonphysician employees, thus requiring an additional payment of $400,000 for each of the two doctors.[2] The Clinic claimed that because the Fund accepted the $400,000, the Clinic owed nothing more and the Fund was obligated to defend the Clinic as well as the physicians.

The Ericksons eventually settled with all defendants and the court dismissed their claims, leaving for

---

[2] Because physicians are included in the definition of "health care provider" in ch. 655, STATS., the $400,000 cutoff applies separately to Drs. Gundersen and Shurtleff. As to the nonphysician employees, however, the underlying insurance of $400,000 covers them collectively. As the trial court stated:

> Thus, if two physicians were negligent, the total underlying coverage would be $800,000. However, as to non-physician employees of [the] Clinic, there was only one $400,000 coverage. If four *non-physician* employees of [the] Clinic were negligent, the maximum [insurance] would be $400,000. . . . If . . . two doctors were negligent, the maximum exposure would be . . . $400,000 for each of the physicians.

(Emphasis in original.)

resolution only the Clinic's cross-claim against the Fund for refusing the tender of the physicians' defenses.

The Clinic and the Fund then entered into a stipulation that the Clinic would contribute an additional $1,000,000 to the Ericksons' settlement and that, if the Clinic were to prevail on its cross-claim against the Fund, it would recover no more than $800,000 from the Fund. The Clinic then sent an offer of settlement to the Fund, offering to settle its cross-claim for $799,999. The Fund rejected the offer, and the Clinic moved for summary judgment on the cross-claim.

The Fund, opposing the motion, argued that there could be no accord and satisfaction because there was no disputed claim between the parties at the time the $400,000 was paid. The Fund also asserted that there were disputed factual issues as to the parties' intent in entering into the "agreement," and that even if the payment could be considered as covering all employees, physician and nonphysician alike, it was entitled to rescind because of its mistaken assumption that only the nonphysicians were covered.

The trial court ruled first that there had been an accord and satisfaction, concluding: (1) that a "dispute" had existed between the parties when the agreement was struck because the extent of Chad Erickson's injuries, and the nature and degree of the Clinic employees' negligence, were uncertain at that time; and (2) that the exchange of letters constituted their agreement to resolve that dispute. The court went on to reject the Fund's claim of mistake and entered judgment for the Clinic in the amount of $800,000.

Because the Clinic's damages were "liquidated," the court awarded prejudgment interest at the statutory rate of five percent. It then added interest at

twelve percent under § 807.01(4), STATS., because the amount recovered by the Clinic equaled or exceeded its offer of settlement. Adding the interest, costs, and $49,382 in attorney fees, the total judgment entered against the Fund amounted to $903,929.

The Fund appeals, renewing the arguments made in the trial court: (1) the rule of accord and satisfaction does not apply because there was no dispute between the parties at the time of the payment; (2) summary judgment was improper because (a) the "agreement" is ambiguous with respect to its coverage of the physicians, and (b) there is a dispute as to the parties' intent; and (3) if an agreement was reached, it should be voided based on unilateral mistake on the part of the Fund. The Fund also challenges the award of prejudgment interest.

### III. Scope of Review

We review summary judgments *de novo*, *Bank of Sun Prairie v. Esser*, 155 Wis. 2d 724, 730, 456 N.W.2d 585, 587-88 (1990), mindful of the well-established rule that summary judgment on a contract claim should not be granted "when the contract is ambiguous and the intent of the parties to the contract is in dispute." *Energy Complexes, Inc. v. Eau Claire County,* 152 Wis. 2d 453, 466-67, 449 N.W.2d 35, 40 (1989). Determining whether a written document is ambiguous, or whether a factual dispute exists between the parties, is a question of law which we also review independently. *See Continental Casualty*, 164 Wis. 2d at 116, 473 N.W.2d at 586; *Energy Complexes*, 152 Wis. 2d at 467, 449 N.W.2d at 40.

## IV. Accord and Satisfaction

While the Clinic based its cross-claim on accord and satisfaction, the rule does not normally give rise to an affirmative claim or a cause of action. It is, rather, a defense to an action to enforce a claim. In simplest terms, an accord and satisfaction is "a contract to discharge a disputed claim and constitutes a defense to an action to enforce the claim." *Van Sistine v. Tollard*, 95 Wis. 2d 678, 681, 291 N.W.2d 636, 638 (Ct. App. 1980); *see also* § 802.02(3), STATS. (accord and satisfaction is an affirmative defense to be pled in the answer to the complaint).

Even so, for the rule of accord and satisfaction to apply so as to bar an action to enforce a claim, there must have been a "dispute" between the parties which is resolved by a payment in satisfaction of the obligation. *Myron Soik & Sons, Inc. v. Stokely USA, Inc.*, 175 Wis. 2d 456, 463, 498 N.W.2d 897, 900 (Ct. App. 1993).

As indicated, the Clinic initially asserted in its cross-claim that the dispute concerned its maximum exposure under the statutory formula. We see no evidence of such a dispute, however. We agree with the Fund that the formula is plainly set forth in the statute and cases decided thereunder, and that there could be no reasonable dispute as to the statutory directions and requirements.

In its later motion for summary judgment, the Clinic framed the alleged "dispute" in terms of the uncertainties then existing over the extent of Chad's injuries and the negligence of the Clinic employees. Again, we agree with the Fund that, while such uncertainties may have created a disputed claim between the Ericksons and the Clinic, the legal obligations

116

existing between the Clinic and the Fund were never in doubt or dispute but were fixed by statute.

We conclude, therefore, that the parties did not have a disputed claim that the Clinic was attempting to satisfy with its $400,000 payment. Rather, the parties were negotiating an agreement under ch. 655, STATS., by which the Fund, in exchange for the payment, would assume the defense of the Clinic and its employees. The dispute between the Fund and the Clinic which is the subject of this appeal arose only *after* the payment was made, and the theory of accord and satisfaction provides no basis for the Clinic's cross-claim.

## V. *The Agreement*

The Fund argues that summary judgment on the Clinic's cross-claim was improper because the agreement—consisting of two letters—is ambiguous and the parties' intent in sending the letters is disputed, requiring a trial of those issues.

In determining whether a contract is ambiguous, we look only to the contents of the document or documents themselves. "The language of a contract must be understood to mean what it clearly expresses, and the courts may not depart from the plain meaning of a contract when it is free from ambiguit[y]." *United Farm Agency, Inc. v. Klasen*, 112 Wis. 2d 634, 641, 334 N.W.2d 110, 113 (1983).

Confining ourselves to the language of the letters exchanged by the parties, we see no ambiguity. It is true, as the Fund asserts, that the Clinic's letter did not specifically note that the physicians, like the cardiopulmonary technicians, were Clinic employees. We do not see how the absence of that information can create

117

ambiguity, however, especially in light of the letters' plain language.

The Fund's letter to the Clinic plainly offers to "provid[e] all future defense costs and investigative steps to bring this case to a conclusion" and states that, upon receipt of the $400,000, the Fund would "assume all expenses, investigative costs and efforts . . . until this case is closed." The Clinic's response seals the agreement: "the $400,000 is the *only payment* that will be required to be made from the . . . Clinic . . . in connection with current and future claims arising out of the Chad Erickson incident." (Emphasis in original.) We see no ambiguity in the written agreement and thus do not consider the extrinsic evidence offered by the Fund in an attempt to alter the plain import of the language just quoted.[3]

---

[3] The Fund's argument that the written agreement is ambiguous proceeds from statements of what Gerald Peura, the author of the Fund's initial letter to the Clinic, thought, felt, or believed at the time the letters were exchanged. On the point of the letters' silence as to which specific people were to be covered by the Clinic's tender, for example, the Fund asserts that "Peura did not . . . know that the physicians involved in the surgery were employed by the Clinic or . . . insured by the Clinic's self-insurance plan."

As we have indicated, when determining whether a contract is ambiguous, we look to the face of the contract itself. *First Wis. Nat'l Bank v. Ford Motor Credit Co.*, 94 Wis. 2d 622, 638, 289 N.W.2d 288, 295 (1980). Extrinsic evidence is not relevant to whether there is an ambiguity in the written document or documents. Thus, while claims based on such assertions may be relevant to an argument that one or more of the parties was laboring under a mistake of fact at the time the agreement was concluded (see part VI *infra*), they are irrelevant to determining whether the agreement is ambiguous.

## VI. Mistake

Finally, the Fund argues that, even if we disagree with its contention that the agreement is ambiguous (as we do), we should nonetheless reverse and remand for trial on its claim that the agreement should be rescinded on grounds of "unilateral mistake." The Fund claims mistake in that Peura "did not know that the physicians were Clinic employees" and believed that the Clinic was tendering only the defense of the two nonphysician employees.

Relying on the Restatement of Contracts, the Fund argues that a party may rescind if, at the time the agreement was concluded, it made a mistake "as to a basic assumption" which has an adverse effect on it, if (a) the mistake leads to an unconscionable result or (b) "the other party had reason to know of the mistake or . . . caused the mistake." RESTATEMENT (SECOND) OF CONTRACTS § 153 (1981).

The Fund has not, however, cited any Wisconsin case adopting or commenting on the Restatement rule.[4] Even so, we believe the Restatement citation is unavailing, for the Fund has not persuaded us that the result is unconscionable or that the Clinic was either "at fault" for the mistake, or knew or had reason to know that a mistake existed.

The Fund refers us to the letter from Nenarella to Applebury, written two weeks after the exchange of the initial correspondence, in which Nenarella states that

---

[4] The Fund offers only a 1930 case, *Miller v. Stanich*, 202 Wis. 539, 542-43, 230 N.W. 47, 48 (1930), in which the court stated that a party might be entitled to rescission based on unilateral mistake if he or she can establish "fraud" on the part of the other party, or that the other party knew that the first party "was laboring under a mistake."

the Fund was accepting "your tender of your limits" as "the only payment that will be required to be made from the . . . Clinic . . . . arising out of any acts by employees of the . . . Clinic." Based on that statement, the Fund asserts that the Clinic "knew that $400,000 represented the limits of its liability for the non-physicians only," and therefore the Clinic "had reason to know . . . that the Fund believed that the tender applied only to the non-physicians." Thus, says the Fund, the Clinic must have known of the Fund's mistake and the Fund is entitled to rescind the agreement under the Restatement rule. We disagree for several reasons.

Nenarella's letter was, as indicated, written some time after the exchange of correspondence between Applebury and Peura, and we do not believe it is properly considered part of the "agreement." Indeed, the Clinic sent the check on the very day the Applebury/Peura letters were exchanged, and the Fund deposited it on the same day Nenarella mailed his letter to Applebury. Even so, Nenarella's letter states: "I must remind you . . . that if there are *other physicians* who have independent acts of negligence in this matter, we will seek contribution from them as well." (Emphasis added.) We agree with the Clinic that the letter, by differentiating between Clinic employees and "other physicians," plainly implies that physicians who are Clinic employees are included in the agreement and other physicians are not.[5] We do not consider Nenarella's letter to constitute grounds for rescission under any test.

[5] And, as the quoted language from the letter indicates, Nenarella made it clear that the payment was the "only payment" that was to be made from the Clinic "arising out of any acts by [Clinic] employees . . . ."

## VII. *Prejudgment Interest*

 At common law, a party may recover prejudgment interest on damages that are either liquidated or determinable by a "reasonably certain standard of measurement." *Beacon Bowl, Inc. v. Wisconsin Elec. Power Co.*, 176 Wis. 2d 740, 776-77, 501 N.W.2d 788, 802 (1993) (quoting *Laycock v. Parker*, 103 Wis. 161, 186, 79 N.W. 327, 335 (1899)).

The trial court determined that the Clinic's damages of $800,000 were "liquidated" and allowed interest at the legal rate of five percent. Because the Clinic had made an offer of settlement for $799,999, which was not accepted by the Fund, the court also concluded that the Clinic was entitled to interest at twelve percent from the date of the offer pursuant to § 807.01(4), STATS.[6] And because the court could find nothing in the statutes governing interest and costs to indicate otherwise, it "stacked" the interest, awarding five percent from September 3, 1991 (the date the Clinic settled its case with the Ericksons), to the date judgment was entered on the Clinic's cross-claim (January 13, 1993), and adding interest at twelve percent "on that portion of the judgment amount unpaid from July 12, 1991 [the date of the Clinic's offer of settlement], until [the judgment is] paid." The effect of the court's order was to require the Fund to pay seventeen percent interest from September 3, 1991, to January 13, 1993. And while the court felt it was "somewhat ludicrous" to

---

[6] The statute provides:

> If there is an offer of settlement ... which is not accepted and the party recovers a judgment which is greater than or equal to the amount specified in the offer ... the party is entitled to interest at the annual rate of 12% on the amount recovered from the date of the offer ... until the amount is paid.

award such interest, it believed it had no discretion in the matter: "Both the 5 percent interest and the 12 percent interest are creatures of . . . separate statutes. . . . There is nothing in either statute that I can find that precludes awarding both. . . . There's nothing that says they are mutually exclusive."

The Clinic argues that we should approve the stacking of interest because the legislature has not indicated that such a result is inappropriate, and it points to *Beacon Bowl* as authority for its position. The *Beacon Bowl* court stated in its opinion that, "[i]n addition to the common-law rules regarding preverdict interest, the legislature has provided conditions under which plaintiffs may receive preverdict interest on both liquidated and nonliquidated damages." *Beacon Bowl*, 176 Wis. 2d at 778, 501 N.W.2d at 803 (citing § 807.01(4), STATS.). In *Beacon Bowl*, however, there was no offer of settlement under § 807.01(4), and we do not consider the court's *dictum* as requiring the result reached by the trial court in this case.

The Clinic also refers us to *Graves v. Travelers Ins. Co.*, 66 Wis. 2d 124, 139-40, 224 N.W.2d 398, 406-07 (1974), where the court concluded that an award of double costs under § 269.02(3), STATS., 1973, the predecessor to § 807.01(4), STATS., was appropriate in a case where damages were liquidated.[7] Again, however, there was no discussion of the relationship between the offer-of- settlement statute and the award of common-law prejudgment interest. *Graves* does not advance the Clinic's position.

Finally, the Clinic points to language in § 807.01(4), STATS., stating that an award of interest

---

[7] The statute did not provide for interest but provided for double costs, where an offer of settlement is rejected and a greater judgment is eventually entered.

under that section is in lieu of interest under § 814.04(4) (providing for interest for the period between verdict and judgment) and § 815.05(8), STATS. (providing for interest upon execution of judgment). It argues that if the legislature had intended that offer-of-settlement interest under § 807.01(4) be in lieu of any award of common-law prejudgment interest, it would have said so. Again, we disagree.

As we have noted, the trial court believed it was bound by statute to combine prejudgment and statutory offer-of-settlement interest.[8] As we also have noted, however, the authority to award prejudgment interest on liquidated damage claims derives from the common law, not the legislature; and we agree with the Fund that whether such interest should be awarded in a given case is for the court to decide. We conclude, therefore, that the legislature's failure to specify in § 807.01(4), STATS., that the interest to be awarded under the statute was in lieu of interest under the common-law "liquidated damages" rule is irrelevant.

Prejudgment interest is not a penalty. Rather, it reflects the value of the use of a liquidated obligation during the time it remains unpaid. *Upthegrove Hardware, Inc. v. Pennsylvania Lumbermans Ins. Co.*, 152 Wis. 2d 7, 13, 447 N.W.2d 367, 369 (Ct. App. 1989). The

---

[8] The Fund suggests that the trial court may have believed that the statute setting the legal rate of interest, § 138.04, STATS., "somehow requires an award of prejudgment interest on liquidated damages." That statute, however, merely determines the rate of interest applicable to the "loan or forbearance of any money, goods or things in action" and thus is not an authorization for, but merely the measure of, interest to be awarded on liquidated claims. *See Estreen v. Bluhm*, 79 Wis. 2d 142, 156, 255 N.W.2d 473, 481 (1977).

same may be said for interest awarded under the offer-of-settlement statute, § 807.01(4), STATS. Its purpose is not punitive; it exists to encourage settlement of cases prior to trial by providing an incentive to accept reasonable settlement offers. *Gorman v. Wausau Ins. Cos.*, 175 Wis. 2d 320, 328, 499 N.W.2d 245, 248 (Ct. App. 1993); *DeMars v. LaPour*, 123 Wis. 2d 366, 373, 366 N.W.2d 891, 894 (1985).

Because neither the statute nor the common-law rule reflect a punitive purpose, we conclude that the Clinic should not be compensated under both. We believe the Clinic will be adequately compensated by applying the twelve percent rate for the period July 12, 1991, to the time the judgment is paid. We therefore remand to the circuit court, with directions to recalculate the interest as indicated.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded for further proceedings consistent with this opinion.