MYRON SOIK & SONS, INC., Arlyn G. "Butch" West, Lee Chipman, Turzinski Poultry Farms, Inc., Bruce Russel, and Mark Russel, d/b/a Russel Brothers Farms, Donald Rowe, David Rowe and Daniel Rowe, d/b/a Rowe Farms, Plaintiffs-Respondents,†

Jerome WOYAK and Jack Woyak, Russel G. Rilling, Donald Buehring, Wayne Remer and Larry Remer, Eugster's Farm Market, Inc., Sunnyside Seed Farms, Inc., Larry Pulsfus, Richard Schram, Dennis Schram, and Edward Schram, d/b/a Schram Farms, Daniel E. Yeska and Ed Yeska, d/b/a Yeska Brothers Farms, Leroy Cayce and Ryan Kramer, d/b/a Cayce Farms, Adams Farms, Inc., Arnold Bomkamp, Donald Krueger and David Krueger, d/b/a Double D Farms, James E. Treinen, Colburn Farms, Inc., John Lindscheid and Bill Lindscheid, Kenneth Herschleb and Richard Herschleb, Betty Timm, Okray Family Farms, Inc., Wysocki Farms, Inc., K & K Farms, Inc., William Spurley and John Meffert, d/b/a Meffert Farms, Class Members-Respondents,

v.

STOKELY USA, INC., Defendant-Appellant.

Court of Appeals

*No. 92-0251. Submitted on briefs August 6, 1992.—Decided March 25, 1993.*

†Petition to review denied.

(Also reported in 498 N.W.2d 897.)

For the defendant-appellant the cause was submitted on the briefs of *David V. Meany* and *Grant C. Killoran* of *Michael, Best & Friedrich* of Milwaukee.

For the plaintiffs-respondents the cause was submitted on the brief of *Anderson, Shannon, O'Brien, Rice & Bertz* by *Thomas W. Bertz*, Stevens Point, and *Daniel G. Golden*, Plover.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

EICH, C.J.   This is a class action by farmers growing corn under contract with Stokely USA, Inc., a vegetable canning company. The growers sued Stokely, claiming the company had failed to pay the amounts due them under the contracts.

The growers' claims center on a section of the 1990 corn contract providing a method of payment for "passed acreage"—corn grown by them but not taken by the company. Under the contracts, passed acreage payments were to be made from a fund set up with equal contributions from the growers and the company based on total tons harvested from all growers. Believing that the payments made by Stokely under these provisions were inadequate, the growers sued.

The plaintiff class included several growers who had retained and cashed the checks Stokely had sent to them for the 1990 crop, and the company moved for summary judgment dismissing these plaintiffs from the action. Stokely claimed that the checks had been properly calculated under the terms of the contract and that their acceptance and negotiation by the growers constituted an accord and satisfaction of the company's obligations under the contracts.

The trial court denied the motion, concluding as a matter of law that the defense of accord and satisfaction was unavailable to Stokely, and we granted Stokely leave to appeal. We reverse the trial court's order and remand with directions to grant Stokely's motion and enter judgment dismissing the named plaintiffs from the action.

The material facts are not in dispute. In early 1990, Stokely contracted with various Wisconsin corn growers to purchase sweet corn. The contracts were all identical and contained provisions for payment to the growers if

some or all of their corn crop was "passed"—if it was fit for harvest but Stokely declined to take it. The passed acreage provisions of Stokely's 1990 Sweet Corn Contract provided as follows:

> The [Growers'] compensation for the production of sweet corn suitable for processing and fit for harvesting but not harvested at the direction of the Company shall be computed as if it were harvested. . ..
>
> The [Growers] and the Company agree to share the cost of payments made for non-harvested crops . . . as follows: Total payments made for non-harvested sweet corn acreage will be divided by total tons of sweet corn produced . . . to establish a per ton allocation of said cost. The [Growers] will be responsible for this cost up to a maximum of $2.00 per ton. The Company will be responsible for this cost in excess of $2.00 a ton up to a maximum contribution of an additional $2.00 per ton. *In the event that the combined contribution of $4.00 per ton . . . is not sufficient to meet total calculated non-harvested crop compensation, payment will be prorated to the extent of funds collected from the Company and [the Growers]*. (Emphasis added.)

During the 1990 harvest, Stokely "passed" some or all of the corn it had agreed to purchase from the growers. Then, after the season, Stokely notified the growers by letter that the money that had been paid into the crop compensation fund under the provisions of the contract was insufficient to pay them in full for their passed acreage crops and that, as a result, they would be receiving prorated payments:

> This is to inform you that the non-harvested crop compensation fund is not sufficient this year to pay total calculated non-harvested crop compensation in full. This means your payment will be pro-

rated to the extent the claims against the fund exceed its amount. The exact amount of the proration is now being calculated. . ..

. . ..

Details as to the proration will accompany your check.

A few days later, Stokely mailed checks in reduced amounts to the growers, along with a letter stating:

Enclosed is your Stokely USA, Inc., 1990 Sweet Corn contract payment.

Your payment has been calculated according to the formula set forth in the contract for non-harvested crops. . ..

Unfortunately, the total fund of $1,029,375.05 is insufficient to pay claims against it in full, and as a consequence, your payment has been prorated. The proration is 53.49%.

Please contact me if you have any questions.

As indicated, Stokely's defense and summary judgment motion were grounded on its claim that the growers who cashed the checks had accepted them in full satisfaction of the growing contracts. The trial court, recognizing that a dispute must exist between the parties in order for an accepted payment to constitute an accord and satisfaction of a debt, concluded that Stokely was not entitled to raise the defense because no such dispute existed at the time the checks were received and cashed.

In summary judgment cases, we employ the same analysis as the trial court. *State Bank of La Crosse v. Elsen*, 128 Wis. 2d 508, 511, 383 N.W.2d 916, 917 (Ct. App. 1986). We look first to the pleadings to determine whether the complaint states a claim for relief and the responsive pleading joins the issues. If they do, we next look to the moving party's affidavits and other proofs to

determine whether that party, if a plaintiff, has stated a *prima facie* case for relief—or, if a defendant, a *prima facie* defense. If they do, we then look to the opposing party's affidavits to determine whether a genuine issue exists as to any material fact—or whether reasonable conflicting inferences may be drawn from the undisputed facts. If any such disputed facts or inferences exist, a trial is necessary and summary judgment is inappropriate. If, however, the material facts are not in dispute, the legal issues presented by the motion are appropriate for determination. *Id.* at 511-12, 383 N.W.2d at 917-18.

The analysis may end at any point. If the complaint fails to state a claim upon which relief may be granted, we proceed no further and dismissal of the action is appropriate. If, at the next stage, it is determined that the moving party's affidavits and proofs fail to state a *prima facie* case for recovery—or, if a defendant, a *prima facie* defense—the analysis ends at that point and the motion is denied.[1] And if the final inquiry reveals a dispute as to material facts or inferences, the motion must also be denied. This is so because summary judgment is appropriate only where there are no issues of material fact and it appears that the moving party is entitled to judgment as a matter of law. *See In re Cherokee Park Plat*, 113 Wis. 2d 112, 116, 334 N.W.2d 580, 582-83 (Ct. App. 1983).

In this case, the moving party is the defendant, Stokely, who seeks a determination upholding its affirmative defense and dismissing various plaintiffs from the action. As a result, we need not consider the pleadings.

---

[1] It was at this point that the trial court ended its analysis in this case, concluding that Stokely's proofs had failed to establish, *prima facie*, that it was entitled to the defense of accord and satisfaction.

Nor does either party assert that there is any material factual dispute. The issue in the case, then, is whether, on those undisputed facts, and as a matter of law, Stokely is entitled to the defense of accord and satisfaction as to the growers who retained and cashed the checks.

■

An accord and satisfaction is an agreement to discharge an existing disputed claim and constitutes a defense to an action to enforce the claim. *Hoffman v. Ralston Purina Co.*, 86 Wis. 2d 445, 453, 273 N.W.2d 214, 217 (1979). It is a rule "resting not only on principles of contract law but on principles of sound public policy, that is, interests of resolving disputes informally without litigation and of fairness." *Flambeau Products Corp. v. Honeywell Info. Sys., Inc.*, 116 Wis. 2d 95, 110-11, 341 N.W.2d 655, 663 (1984). In *Flambeau*, the supreme court discussed the principles underlying the rule and the protections it affords to the debtor.

> The interests of fairness dictate that a creditor who cashes a check offered in full payment should be bound by the terms of the offer. The debtor's intent is known, and allowing the creditor to keep the money disregarding the debtor's conditions seems unfair . . .. The doctrine of accord and satisfaction includes safeguards designed to protect a creditor from an overreaching debtor: there must be a good faith dispute about the debt [and] the creditor must have reasonable notice that the check is intended to be in full satisfaction of the debt. 116 Wis. 2d at 111, 341 N.W.2d at 663.

The *Flambeau* court also discussed the various rules that come into play when considering the defense of accord and satisfaction, two of which are relevant to our inquiry in this case:

463

First, the law in Wisconsin has long been that payment in full settlement of a claim which is disputed as to amount discharges the entire claim. . ..

A second rule, also of long-standing, is that payment of part of a debt which is not disputed as to amount does not discharge the debt altogether . . .. The debtor's mere refusal to pay the full claim does not make it a disputed claim. 116 Wis. 2d at 113, 341 N.W.2d at 664.

We thus consider whether there was a dispute between Stokely and the growers at the time the checks were received and cashed, and whether the growers had reasonable notice that Stokely's checks were intended by the company in full satisfaction of its obligations under the "passed acreage" provisions of the contracts. We review both issues *de novo. See Raby v. Moe*, 153 Wis. 2d 101, 109, 450 N.W.2d 452, 455 (1990).

The growers maintain that the trial court's conclusion was correct: that "no dispute or controversy between plaintiffs and Stokely [existed] since the amount to be paid . . . on the passed acres was not even known to the plaintiffs prior to the time they received the check[s]." They point out that, prior to that time, "[t]here were no negotiations and no compromises" between themselves and Stokely, and thus there could be no dispute. As we perceive it, the argument is that a dispute must have existed—evidenced by announced disagreements, or prior negotiations or compromises— *prior* to the date on which the checks were received in order for their acceptance to constitute an accord and satisfaction. They also contend that they had no notice that the checks were tendered by Stokely in full payment under the 1990 growing contracts.

We think *Flambeau* is particularly instructive on the points raised. In that case, the debtor, Flambeau, contracted to purchase computer equipment from Honeywell. As part of the package, Flambeau was to receive $14,000 worth of programming services. These services, however, turned out to be of no use to Flambeau; and when advised by Honeywell of the full amount due on the equipment purchase contract, Flambeau deducted $14,000 from that amount and sent Honeywell a check in the reduced amount. A notation on the check indicated that it was in "full payment" of the amount due, and an accompanying letter contained a similar statement. Honeywell cashed the check but continued to seek the additional $14,000 from Flambeau, who raised the defense of accord and satisfaction.

The supreme court had no difficulty concluding that Flambeau's defense defeated Honeywell's claim—despite the fact—as the trial court found—that "there was no dispute about the account known to Honeywell until the check . . . was tendered by Flambeau." *Flambeau,* 116 Wis. 2d at 115, 341 N.W.2d at 665. The court rejected Honeywell's argument that "a dispute must have been manifest before the settlement offer is made" in order for there to be an accord and satisfaction. *Id.* at 115 n.15, 341 N.W.2d at 665. And it refused to set aside the trial court's determination that "when Honeywell received the check it was faced with an offer by Flambeau to satisfy a disputed claim." *Id.* at 115, 341 N.W.2d at 665.

We conclude that a "dispute" sufficient to support application of the rule of accord and satisfaction existed between Stokely and the plaintiff growers. We are also satisfied that the growers had adequate notice that the checks were tendered in full payment under the 1990 growing contracts.

465

Prior to receiving any communication from Stokely, the growers knew from the terms of their contracts that they were to be paid for "passed" acreage in an amount calculated "as if [that acreage] had been harvested," and that these payments would come from a fund comprised of equal contributions from Stokely and themselves. They also knew that in the event these contributions were insufficient to allow Stokely to pay at the "harvested crop" rate, they would receive only a prorata share of the amount of money actually in the fund.

Then, after the harvest, the growers were informed by Stokely's first letter that their payment "this year" would have to be prorated under the contract. And in a second letter—the one enclosing the lower-than-expected checks—they were plainly advised that the amount being paid constituted "your Stokely . . . 1990 Sweet Corn crop payment," and the details of the prorata calculation were explained to them.

The growers, obviously, had expected to receive a larger amount. But, armed with the above information, they nevertheless decided to cash the checks. Admittedly, the checks did not contain the words "full payment," as in *Flambeau*; but we do not believe such "magic language" is essential to the debtor's ability to raise the defense of accord and satisfaction. The test, after all, is one of reason: "[T]he creditor must have *reasonable notice* that the check is intended to be in full satisfaction of the debt." *Flambeau*, 116 Wis. 2d at 111, 431 N.W.2d at 663.

We conclude on this record that: (1) at the time the checks were received and cashed a "dispute" within the meaning of the rule of accord and satisfaction existed between Stokely and the plaintiff growers, all of whom, obviously, disagreed with the company's application of the prorata clause; and (2) the correspondence preceding

and accompanying the reduced payment gave the growers reasonable notice that the checks were intended as full payment under the contract. As a result, the growers' acts of accepting and cashing the checks must be considered acceptance of the tendered amount in full settlement of Stokely's obligations under the 1990 corn contracts.

*By the Court.*—Order reversed and cause remanded for further proceedings consistent with this opinion.

GARTZKE, P.J. (*dissenting*). I disagree with the analysis in the majority opinion and I partially disagree with the result.

> An "accord and satisfaction" is an agreement to discharge an existing disputed claim, whether the claim be one arising in contract, tort, or otherwise. An "accord and satisfaction" constitutes a defense to an action to enforce the claim.
>
> Ordinary contract principles apply in determining whether an agreement of "accord and satisfaction" is reached. Mere performance does not operate as a satisfaction unless offered as such to the creditor or claimant. *There must be expressions sufficient to make the creditor understand or to make it unreasonable for him not to understand that the performance is offered in full satisfaction of the claim.*

*Hoffman v. Ralston Purina Co.*, 86 Wis. 2d 445, 453, 273 N.W.2d 214, 217 (1979) (citations omitted and emphasis added).

*Flambeau Products Corp. v. Honeywell Information Sys., Inc.*, 116 Wis. 2d 95, 341 N.W.2d 655 (1984), is an accord and satisfaction case but it is not on point. In *Flambeau,* the debtor mailed a check to the creditor marked "in full payment of liability to you" and a letter stating that the check was "in full settlement of notes we

owe" to the creditor. The check was for an amount not in dispute between the parties. The dispute was whether the debtor owed more than that amount. That the debtor had offered the check in full payment and the creditor had accepted the offer was not an issue on appeal. *Id.* at 112, 341 N.W.2d at 664. But that did not resolve the accord and satisfaction issue. Because contract principles apply, the issue was whether consideration had been given. Indeed, "[t]he *sole* issue in contention between the parties in this case as to whether there was a valid accord and satisfaction is whether there was consideration for the discharge of the claim." *Id.* (emphasis added). The court concluded that payment of the undisputed portion of a disputed claim by a check marked "paid in full" was consideration for the discharge of the disputed portion of the creditor's claim, and consequently consideration was given. *Id.* at 118, 341 N.W.2d at 666-67.

I turn to the case before us. The appendix to this dissent contains the texts of Stokely's two letters to the growers. Nothing in either letter indicates that Stokely was or would be making an offer to settle a dispute with each grower or that the grower who cashed Stokely's forthcoming check would have accepted an offer to settle. Neither letter refers to or even suggests a dispute. The checks sent to the growers bore no language to show that a dispute existed. No check was marked "payment in full" or "in full and final settlement" or words to that effect. Thus, the letters and the checks do not satisfy the elements of an accord and satisfaction: "expressions sufficient to make the creditor understand or to make it unreasonable for him not to understand that the performance is offered in full satisfaction of the [disputed] claim." *Hoffman*, 86 Wis. 2d at 453, 273 N.W.2d at 217.

468

We must look beyond Stokely's letters and checks to determine whether the growers read or should have read them as offers to discharge disputed claims. The question is whether facts or circumstances were known to a grower which would or should reasonably have caused the grower to read the letters and the check as an offer to settle for the amount of the check. Whether those facts or circumstances existed depends upon the knowledge of the grower no later than the time the grower cashed the checks, since that act would have accepted the offer to settle. Stokely explored those facts and circumstances in the deposition of each grower, and Stokely relies on those depositions to support its motion for summary judgment dismissing the complaint as to each grower.

When examining the portions of each grower's deposition on which Stokely relies, we are to carefully scrutinize that material, drawing inferences from the facts contained in it viewed in the light most favorable to the grower. *Kraemer Bros. v. United States Fire Ins. Co.*, 89 Wis. 2d 555, 567, 278 N.W.2d 857, 862 (1979). "If the material presented on the motion is subject to conflicting interpretations or reasonable men might differ as to its significance, it is improper to grant summary judgment." *Id*. And if Stokely's submissions "fail to establish clearly that there is no genuine issue as to any material fact, the motion must be denied." *Id*. Since the growers offered nothing in opposition to Stokely's motion, we can decide whether it should be granted or denied as to an individual grower on the basis of Stokely's submissions.[1]

The pertinent parts of each grower's deposition and my conclusion regarding Stokely's motion are as follows:

---

[1] The court struck the only affidavit submitted in opposition to Stokely's motion.

1. Donald Buehring. He recalls receiving Stokely's first letter. Before he cashed the check, he felt that a dispute existed. He was glad that others would be involved in a suit. The motion was properly granted as to Buehring.

2. Joseph Okray. He is president of Okray Family Farms. The check was for considerably less than Okray thought he would receive. He thought if he cashed the check, that was the end of his "litigation rights." But he cashed it. The motion was properly granted as to him.

3. Thomas Eugster. After receiving its letters he called Stokely and was told that the check represented all of the money he was going to get. Before he cashed it, he learned that there had been talk about a class action against Stokely. The motion was properly granted as to Eugster.

4. LeRoy Cayce. He received four checks, cashed three the next day and the fourth about a week later. He retained the fourth check because there was a question of "whether it would constitute satisfaction on our part with Stokely." He wrote "partial payment" on the fourth check at the suggestion of a grower who was thinking about starting a lawsuit. The motion was properly granted as to Cayce.

5. Jerry Knutson. He read Stokely's two letters. He knew there was a dispute at the time he received his checks. The motion was properly granted as to Knutson.

6. William Spurley. Before cashing his check, he spoke with a Stokely official as to how the check was calculated, he was disappointed about the amount, thought it would be more and knew that Stokely considered it as payment in full. He nevertheless cashed the check. The motion was properly granted as to Spurley.

7. Betty Timm. She received letters regarding the proration and contacted Stokely before receiving the

check but did not receive satisfactory answers. She thought the amount was not enough. She complained and felt she and her husband "were not getting the full amount of the check that we should have been receiving." She had discussions with other growers about what they should do, including possibly hiring a lawyer. She and her husband did contact a lawyer. The motion was properly granted as to Timm.

8. Larry Pulsfus. He read Stokely's two letters. When he received the check he knew there were "a lot of hard feelings" but he did not realize that a lawsuit would arise. He knew of the hard feelings because he talked to a Stokely official. The motion should be denied as to Pulsfus.

9. Ray Ribordy. When Ribordy received the check, he was not aware of a dispute over the amount and had no communications with Stokely or other growers before cashing the check. He anticipated receiving another check from Stokely. The motion should be denied as to Ribordy.

10. Bill Lindscheid. About the time he cashed the check he called Stokely and asked if that was all he was going to get. They said "probably." He then talked to other growers about the check. It is unclear whether he cashed the check before or after his contacts with Stokely. The motion should be denied as to Lindscheid.

11. Jerry Adams. His deposition is confusing. When he received Stokely's checks he "was somewhat aware" of a dispute about the amount due from his discussions with other growers. He did not know what the problem was. But he also deposed that he did not contact Stokely or talk with other growers about his checks before cashing them. The motion should be denied as to Adams.

12. Arnold Bomkamp. He read Stokely's letters before cashing his check and understood them to mean that "all they [Stokely] wanted to pay is that 53.49%." But he did not know of a dispute when he received the check. He "presumed" that the check was all he was to get and it was for less than he thought it would be. He was not told the check was sent in full satisfaction of what Stokely owed. The motion should be denied as to Bomkamp.

13. Larry Remer. Before receiving his check he read Stokely's letters. He did not contact Stokely about the letters. He cashed the check within a week. The motion should be denied as to Remer.

14. Ralph Turzinski. He read Stokely's two letters. He cashed the check within a couple of hours after he received it and did not discuss it with Stokely or any other grower. He did not understand that the check was payment in full. There were no "offers" or "counteroffers." The motion should be denied as to this grower.

15. Jack and Jerome Woyak. According to Jack, as soon as the check was received, the farm secretary cashed it. He did not talk to Stokely or other growers about it. According to Jerome, he discussed the check with his secretary before cashing it the next day and believed he would be receiving more checks. He recalls reading Stokely's second letter. The motion should be denied as to Jack and Jerome Woyak.

16. Lee Chipman. There was no dispute before the checks were sent out. He read Stokely's two letters. He discussed his check with other growers before cashing it and with a Stokely official about the amount. He expected a check for more, and wrote "part payment only" on the check when he cashed it. He was told "they [Stokely] were looking at ways to find more, find more money to pay." The motion should be denied as to him.

17.   David Rowe. When he read Stokely's first letter, he thought there would be discussions about the amount. He anticipated that more money would be forthcoming because he felt that Stokely's figures were wrong. He spoke to Stokely but is not certain whether that was before or after he cashed the check. He discussed the check with his brothers but probably not with other growers. The motion should be denied as to Rowe.

18.   Russel Rilling. He read Stokely's letters. Before cashing the check he called Stokely to learn how they figured the amount. He cashed it within a couple of days without discussing it with other growers. The motion should be denied as to Rilling.

19.   Dennis and Charlotte Schram. Charlotte Schram handles the books for the family farm. She had no contact with Stokely about the check. Dennis Schram thought that no one from his farm had contacted Stokely before the check was cashed. The motion should be denied as to the Schrams.

20.   Randy Yeska. He was not aware of any dispute when he received the checks. He waited about three weeks before cashing the checks "more or less in protest." A week or so after he received the check the Wisconsin Potato and Vegetable Growers Association told him "not to cash them yet." He thought that they would be receiving another check. The motion should be denied as to Yeska.

21.   Donald Krueger. He read Stokely's two letters. He did not know of a dispute when he received the check. He discussed the check with other growers before cashing it. His brother called Stokely to find out if they were going to get more. The motion should be denied as to Krueger.

22.   Ken Herschleb. He read Stokely's two letters. Before he cashed the check he was aware of dissatisfac-

tion among the growers. He was not satisfied with the amount. Stokely officials hinted to him that he might receive another check but other officials seemed to think it was full payment. He anticipated more checks would be forthcoming to him. The motion should be denied as to Herschleb.

To summarize, the judgment before us dismissing complaints of individual farmers should be affirmed as to Buehring, Okray, Eugster, Cayce, Knutson, Spurley and Timm, and reversed as to Pulsfus, Ribordy, Lindscheid, Adams, Bomkamp, Remer, Turzinski, Jack and Jerome Woyak, Chipman, Rowe, Rilling, Schram, Yeska, Krueger and Herschleb.

## APPENDIX

Stokely's letter of November 28, 1990, addressed to "Dear Grower" stated as follows:

> This is to inform you that the non-harvested crop compensation fund is not sufficient this year to pay total calculated non-harvested crop compensation in full. This means your payment will be prorated to the extent the claims against the fund exceed its amount. The exact amount of the proration is now being calculated.

> As you know the cost of payments for non-harvested crops is shared equally by Stokely and the growers through contributions by each to the compensation fund of $2.00 per ton of sweet corn produced, including those not harvested. This is a grower benefit provided by your Stokely contract.

> Details as to the proration will accompany your check.

Stokely's letter of November 30, 1990, addressed to "Dear Grower" stated as follows:

474

Enclosed is your Stokely USA, Inc. 1990 Sweet Corn contract payment.

Your payment has been calculated according to the formula set forth in the contract for non-harvested crops. The way this works, $2.00 per harvested and passed ton of Sweet Corn was deducted from grower payments and contributed to a payment fund. This year that contribution was matched by [an] equal contribution from Stokely of $514,687.52.

Unfortunately, the total fund of $1,029,375.05 is insufficient to pay claims against it in full, and as a consequence, your payment has been prorated. The proration is 53.49%.

Please contact me if you have any questions.