John **KENDRICK** and James **Kendrick, Plaintiffs,**

v.

**EAST DELAVAN BAPTIST CHURCH,** formerly d/b/a **East Delavan Baptist Academy, Defendant.**

**No. 92–C–727.**

United States District Court, E.D. Wisconsin.

May 31, 1995.

---

Ann T. Dempsey, Oliver, Close, Worden, Winkler, Greenwald & Maier, Rockford, IL, for plaintiffs.

M. Christine Cowles, Phyllis M. Santacroce, Borgelt, Powell, Peterson & Frauen, Milwaukee, WI, for defendant.

### DECISION AND ORDER

WARREN, District Judge.

Before the Court is the defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c) ("Rule 56(c)") in the above-captioned matter. For the following reasons, this motion is granted, and this case is hereby dismissed.

## I. BACKGROUND FACTS

### A. Findings of Fact:

The plaintiffs, John Kendrick and his father, James Kendrick, are adult residents of the State of Georgia; John Kendrick's date of birth is December 28, 1972. (Compl. ¶ 3.) The defendant, East Delavan Baptist Church, formerly doing business as East Delavan Baptist Academy (alternatively referred to as "the Academy" or "the Church"), is a religious association and organization with its principal place of meeting and worship in Walworth County, Wisconsin. (*Id.* at ¶ 4.) John Kendrick attended school at the Academy from kindergarten in 1976 through seventh grade in 1986. (*Id.* at ¶ 5; Pl.Mem. Opp'n Summ.J. at 1.)

Floyd Hacker was principal of the Academy from August of 1976 until 1980, when he became administrator of the Academy and Pastor of the Church; Glenn Foster replaced him as principal. (Def.Mem.Supp.Summ.J. at 3; Pl.Mem.Opp'n Summ.J. at 1.) As administrator of the Academy, it was Mr. Hacker's policy to hire persons holding degrees in the fields in which they would be teaching or, at a minimum, having a good understanding of the subject matter, along with good character. (Pl.Mem.Opp'n Summ.J. at 2.) Mr. Hacker would assess the character of teaching applicants through recommendations of other individuals and through previous employment, if possible. (*Id.*) Most of the teachers hired by Mr. Hacker had bachelor's degrees. (*Id.*)

Kyle Parker was employed as a volunteer youth pastor at the Church in September of 1982 and worked as a full-time teacher at the Academy from the fall of 1983 until April of 1984. (Def.Mem.Supp.Summ.J. at 2; Pl. Mem.Opp'n Summ.J. at 2.) John Kendrick was in third, fourth, and fifth grades at the Academy during this time. (Compl. at ¶ 7.) Mr. Hacker does not recall obtaining a resume or job application from Mr. Parker. (Pl.Mem.Opp'n Summ.J. at 2.) Nor does Mr. Hacker recall making any telephone calls or sending correspondence to prior employers or contacting Maranatha Baptist Bible College, his and Mr. Parker's alma mater, for references or grade reports. (*Id.*) Mr. Hacker did talk to John Brazee, Parker's former Pastor at Markesan Baptist Church, but did so only after Mr. Parker had already been employed as a volunteer youth pastor. (*Id.;* Def.Reply Mem.Supp.Summ.J. at 3.)

Mr. Foster objected to Mr. Parker being hired as a teacher for fear that he "would not respond to Glenn Foster's authority as principal" (Pl.Resp. to Def.Proposed Findings of Fact ¶ 3); Mr. Hacker hired Mr. Parker only after he indicated that he would "respect and respond to the authority of the principal." (Def.Reply to Pl.Resp. to Def.Proposed Findings of Fact ¶ 4.) Mr. Parker lived with Mr. Hacker and his family from the fall of 1982 through April of 1984, and frequently helped to care for Mr. Hacker's children. (Def.Mem.Supp.Summ.J. at 3.)

During the time that Mr. Parker taught at the Academy, it had a written corporal punishment policy included in the student handbook which each parent was required to sign. (Pl.Mem.Opp'n Summ.J. at 2.) Under that policy, the student's parents were to personally administer the discipline with a faculty member present. (*Id.*) There also existed at the Academy an unwritten policy that corporal punishment could be administered outside the presence of the student's parents but only if another adult was present and a note was sent to the parents explaining what had happened. (*Id.* at 3.) The "unwritten corporal punishment policy" required that discipline be administered with a paddle and in the presence of a witness. (*Id.*) John Kendrick recalls having corporal punishment inflicted on him by Mr. Parker and other teachers. (Def.Mem.Supp.Summ.J. at 5.)

While the Academy did not have any written policies or procedures regarding the "counseling" of students outside of the classroom during class time, teachers had authority to remove students from class for the purpose of counseling or to impose punishment. (Pl.Mem.Opp'n Summ.J. at 3.) There were apparently no limitations as to when or how long teachers could remove a student from class, and they were not required to report any such instance to administrators. (Def.Mem.Supp.Summ.J. at 3.) During the time of Mr. Parker's employment, Mr. Hacker recalls no complaints being made as to the improper removal of any student from class. (Id.)

When John Kendrick was a student at the Academy, he was removed from class by Mr. Parker ten or more times and reprimanded for "poor grades or improper conduct"; he does not recall the specific dates or years of these occurrences. (Def.Reply to Pl.Resp. to Def. Proposed Findings of Fact ¶ 3; Pl.Mem. Opp'n Summ.J. at 3.) In one instance, after John had been called to the principal's office for calling another student "queer," Mr. Parker purportedly removed him from Mrs. Hacker's class and took him to a back room for a paddling; he then sat the boy on his knee, put his arm around him, and rubbed his back and patted his buttocks while explaining his "sin" and punishment. (Id. at 4; Def.Mem.Supp.Summ.J. at 5.) There were no witnesses to this event and no note sent home to John's parents; Mr. Parker purportedly told the boy not to disclose the punishment to his father. (Pl.Mem.Opp'n Summ.J. at 4.)

On another occasion, Mr. Parker removed John from a classroom, scolded him for not dressing properly, and then used his hand to tuck the boy's shirt into his underwear. (Def.Mem.Supp.Summ.J. at 5.) Yet another time, Mr. Parker took the boy into a restroom after arriving at a gymnasium on a class trip, instructed him to pull his pants down, and paddled him with his bare hand for opening the school's van door too early. (Id.; Pl.Mem.Opp'n Summ.J. at 4.) In another encounter during a one-on-one computer class, Mr. Parker purportedly forced John to sit on his lap and "put his arms around

Kendrick to reach the computer" during the entire class. (Id.; Def. Mem.Supp.Summ.J. at 5.) John never complained to anyone at the Academy or the Church about Mr. Parker's conduct. (Id. at 6.)

In February of 1984, Mr. Hacker received complaints about Mr. Parker from the parents of Jon Gebhardt, another student at the Academy. (Pl.Mem.Opp'n Summ.J. at 5.) Mr. Hacker had never received any complaints regarding Mr. Parker prior to this time. (Def.Mem.Supp.Summ.J. at 4.) Specifically, Mrs. Gebhardt complained that (1) when Mr. Parker had visited their home and her son became ill, he had used a rectal thermometer, rather than an oral thermometer, to check his temperature, and (2) when her son was on an overnight church trip with a number of other students and Mr. Parker, he was awakened during the night when he felt a hand near his genitals. (Def.Mem.Supp.Summ.J. at 4; Pl.Mem.Opp'n Summ.J. at 5; Def.Reply Mem.Supp. Summ.J. at 4.)

After these allegations surfaced, Mr. Hacker started an immediate investigation under the direction of the Church Board; he interviewed both Mr. Parker and Jon Gebhardt, and held a series of meetings with the Gebhardts and the Church Board. (Def.Mem.Supp.Summ.J. at 4; Pl.Mem.Opp'n Summ.J. at 5; Def.Reply Mem.Supp. Summ.J. at 5.) Because he felt that these allegations "revolved around" the Church, rather than the school, Mr. Hacker did not consult with any of the teachers or the administrators at the Academy other than Mr. Foster. (Def.Mem.Supp.Summ.J. at 4; Pl. Mem.Opp'n Summ.J. at 5.) While the investigation was in progress, Mr. Parker was dismissed as youth pastor at the Church; however, he continued teaching at the Academy without restriction. (Id.; Def.Reply Mem.Supp.Summ.J. at 4–5.)

In reviewing the incident, Mr. Hacker does not recall investigating whether Mr. Parker had engaged in any inappropriate conduct with other students at the Academy. (Pl. Mem.Opp'n Summ.J. at 5.) Mr. Foster apparently resigned as principal during this time because he desired to pursue a pastor position elsewhere and because he was con-

cerned with the extent of Mr. Parker's authority at the Academy. (Pl.Resp. to Def.Proposed Findings of Fact ¶ 3.) In mid-March, Mr. Hacker concluded that the allegations involving Mr. Parker could not be proved or disproved as Mr. Parker, who had some medical background, appeared to be "looking after the best interest of the child's health" regarding the thermometer incident, and there was no proof that it was Mr. Parker's hand which approached Jon Gebhardt's genital area. (Def.Mem. Supp.Summ.J. at 4; Def.Reply Mem.Supp. Summ.J. at 5.) Based on these findings, Mr. Hacker decided not to report the matter to the child welfare agency. (Pl.Mem.Opp'n Summ.J. at 5.)

The Gebhardts were not satisfied with Mr. Hacker's determination and continued to seek Mr. Parker's dismissal. (*Id.*) Mr. Hacker then consulted with Dr. Arnold Weniger, the president of Maranatha Baptist Bible College, regarding the matter and a "rumor" he had heard subsequent to his investigation that Mr. Parker "had had some problem with homosexuality previous to his enrollment [ ] at Maranatha." (Def. Mem.Supp.Summ.J. at 4; Def.Reply Mem. Supp.Summ.J. at 5.) From Dr. Weniger's assistant, Mr. Hacker discovered that Mr. Parker had been temporarily dismissed from Maranatha for a brief period after confessing that he had engaged in homosexual activity on a weekend retreat. (*Id.*)

In late-March, a series of meetings were conducted over a three-day span involving Mr. Hacker, Dr. Weniger, and Mr. Parker; at the recommendation of Dr. Weniger, the three agreed that, even though no hard evidence of wrongdoing by Mr. Parker had been established, the best way to resolve the controversy surrounding Mr. Parker would be for him to resign his teaching position at the Academy. (*Id.*) Mr. Parker resigned as a teacher at the Academy and member of the Church on April 1, 1984. (Def.Mem. Supp.Summ.J. at 5.) Prior to the Gebhardt incident, nobody at the Academy or the Church was ever notified of any improper conduct involving Mr. Parker and John Kendrick or any other student. (Def. Mem.Supp.Summ.J. at 6; Def.Reply Mem.

Supp.Summ.J. at 3; Def.Reply to Pl.Resp. to Def.Proposed Finding of Fact at ¶ 6; Pl. Resp. to Def.Proposed Finding of Fact at ¶ 5.) In addition, John Kendrick had no knowledge of any other children having inappropriate encounters with Mr. Parker. (Def. Mem.Supp.Summ.J. at 6.)

While he was in high school, John Kendrick claims that he "identified Kyle Parker as a homosexual"; at that time, he "considered homosexuality to be the same" as child abuse. (Def.Mem.Supp.Summ.J. at 6.) In August of 1991, John Kendrick had a confrontation with a friend who had placed his hand on John's leg and touched his genitals while they were driving. (*Id.* at 6–7.) In response, John grabbed the man and began hitting and kicking him and his vehicle. (*Id.*) He states that he beat the man uncontrollably, and believes that he was punishing the man for what Mr. Parker had done to him at the Academy. (*Id.;* Pl.Mem.Opp'n Summ.J. at 5–6.) After his outburst, John was taken to the emergency room of a local hospital, where he knocked down a police officer in an attempt to leave. (Def.Mem.Supp.Summ.J. at 7.) He was later taken to Charter Winds Hospital in Athens, Georgia, where he remained an inpatient for two weeks. (*Id.*).

Dr. David Jarrett was John's treating psychiatrist at Charter Winds. (Pl.Mem.Opp'n Summ.J. at 6.) Dr. Jarrett diagnosed John with several psychiatric disorders which he considered to be a direct result of physical and sexual abuse suffered by him as a child. (*Id.*) John was also examined by a psychologist, Dr. Richard Born, who believes that "whatever occurred between [John] and Mr. Parker is having a very significant, long standing impact in terms of creating the current or what was current back when I saw him, as far as my diagnostic impression." (*Id.*)

**B. Procedural Background:**

John and James Kendrick brought this action on July 20, 1992, claiming that Mr. Parker's repeated abuse of John caused "his psychological and emotional breakdown in August of 1991" and that administrators and teachers at the Academy "had actual knowledge of Parker's abusive treatment [ ] and/or

had reasonable cause to believe such abuse was occurring." The Academy should be held liable, they argue, because its officials (1) failed to report Mr. Parker's abuse to the appropriate county child welfare agency in violation of § 48.981 of the Wisconsin Statutes; (2) failed to adequately supervise Mr. Parker by "allowing him to remove Kendrick from classrooms [ ], [to] inflict corporal punishment [ ] without the presence of any other school administrators or teachers, [and] to force unwanted physical contact on John Kendrick"; and (3) failed to inform John's parents of Mr. Parker's allegedly improper conduct with their son. The plaintiffs further claim that "the nature, extent and existence of John Kendrick's injuries were not discovered until August of 1991," and seek monetary damages for John as well as reimbursement for medical expenses incurred by his father. The Church answered on September 2, 1992, denying these claims and bringing several affirmative defenses including, *inter alia*, failure to state claims upon which relief can be granted and failure to meet filing deadlines under the applicable statute of limitations.[1] The Church brought the instant motion on July 29, 1994; the plaintiffs responded on August 31, and the Church replied on September 20.

## II. STANDARD OF REVIEW

Rule 56(c) deems summary judgment appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A genuine issue of fact exists only where a reasonable jury could make a finding in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir.1990). An issue of fact must also be material, as "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. *See also Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir.1992); *Local 1545, United Mine Workers of Am. v. Inland Steel Coal Co.*, 876 F.2d 1288, 1293 (7th Cir.1989). The presence of a genuine issue of material fact is to be determined by the substantive law controlling that case or issue. *Anderson*, 477 U.S. at 254–55, 106 S.Ct. at 2513; *Santiago*, 894 F.2d at 221. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine need for trial and summary judgment is proper. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating that it is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *Local 1545*, 876 F.2d at 1292. Once this burden is met, the non-moving party must "go beyond the pleadings" and designate specific facts to support each element of its cause of action, showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552; *Local 1545*, 876 F.2d at 1293. Neither party may rest on mere allegations or denials in the pleadings, *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Koclanakis v. Merrimack Mut. Fire Ins. Co.*, 899 F.2d 673, 675 (7th Cir.1990), or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985), and both parties must produce proper documentary evidence to support their contentions. *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir.1990); *Local 1545*, 876 F.2d at 1293. In deciding a summary judgment motion, the Court must view the record in a light most favorable to the non-moving party, and all reasonable inferences shall be drawn in that party's favor. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356; *Santiago*, 894 F.2d at 221.

---

1. At a September 30, 1993 Status Conference, the Church informed the Court that it would not pursue its statute of limitations defense.

A court need not draw every inference from the record, only reasonable inferences. *Local 1545*, 876 F.2d at 1292–93; *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 886 (7th Cir.1989).

### III. DISCUSSION

#### A. Parties' Arguments:

According to the Church, the plaintiffs cannot prevail in this matter for two reasons. First of all, the Church claims that, under Wisconsin law, the plaintiffs must provide expert testimony in order to establish that the Church's actions caused John Kendrick's injuries; it argues, however, that because "the plaintiffs' experts cannot testify that the alleged abuse by Parker in 1983 and/or 1984 was a cause-in-fact of their injuries," the plaintiffs cannot show that the Church's failure to report such conduct resulted in such injuries. Secondly the Church argues that, even if improper conduct by Mr. Parker did, in fact, result in injuries to the plaintiffs, it cannot be held liable for failure to report or for negligent supervision because (1) Academy officials had no notice of abusive conduct involving John Kendrick or any other children prior to the Gebhardt incident, and (2) given John Kendrick's memory failure, the plaintiffs cannot show that he was abused after the Gebhardt incident occurred.

The plaintiffs respond that their "medical evidence is sufficient to meet the burden of proving that Defendant's negligence was a substantial factor" in causing their harm, and should therefore be presented to a trier of fact. According to the plaintiffs, both of their psychiatric experts, as evidenced by their depositions, will testify that "John Kendrick's psychological problems were a direct result of having been physically and sexually abused as a child"; the plaintiffs argue that these opinions, while "speculative" to some degree, are nevertheless admissible, and may lead a jury to conclude that the Academy's negligent supervision and failure to notify and report Mr. Parker's conduct directly resulted in their injuries. The plaintiffs further argue that an issue of material facts exists as to whether Academy officials violated § 48.981 by failing to report the Gebhardt incident to authorities, as a jury could con-clude that they had "reasonable cause to believe" that abuse occurred as required under the statute. Finally, the plaintiffs claim that a material issue of fact exists as whether Academy officials, by failing to exercise reasonable care in overseeing Mr. Parker's conduct, were negligent in supervising Mr. Parker; as evidence of this, they cite Mr. Parker's infliction of corporal punishment on John in violation of the Academy's written and unwritten policies and procedures, the Academy's failure to adequately check Mr. Parker's academic and employment background prior to hire, and the Academy's failure to notify other instructors and parents of the Gebhardt incident.

#### B. Analysis

■ The four elements necessary to support a cause of action founded upon negligence are: (1) a duty requiring a person to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) a breach of that duty; (3) "legal or proximate causation," or a reasonably close causal connection between the conduct and the resulting injury (including the notion of cause-in-fact); and (4) actual loss or damage. *See, e.g., Johnson v. Misericordia Hosp.*, 97 Wis.2d 521, 294 N.W.2d 501 (Ct.App.1980); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 30, at 164–65 (5th ed. 1984). Unless a reasonable jury could find that the plaintiffs have established each of these elements, summary judgment in favor of the defendant is proper. Each will be discussed in turn.

##### 1. *Duty:*

■ It seems clear that the defendant, through its administrators and teachers, had a duty to protect its students from physical and sexual abuse occurring at the Academy. During the time in which Mr. Parker was employed by the Church and Academy, *Wis. Stat.* § 48.981(2) provided, in relevant part, as follows:

"A ... school teacher, administrator or counselor ... having reasonable cause to suspect that a child seen in the course of professional duties has been abused or ne-

glected or having reason to believe that a child seen in the course of professional duties has been threatened with an injury and that abuse of the child will occur shall report as provided in sub. (3)."

See, e.g., State v. Williquette, 129 Wis.2d 239, 260, 385 N.W.2d 145 (1986).[2] An intentional failure to adhere to the reporting requirements subjects the violator to criminal penalties, including fines and imprisonment. See Wis.Stat. § 48.981(6). The Wisconsin legislature, then, has specifically imposed on school officials an affirmative duty to protect students from actual or threatened abuse by reporting such conduct to the authorities.

Such a duty may also be predicated on common law; as noted by the Wisconsin Supreme Court:

"First, the fact that a parent owes a duty toward her child does not necessarily relieve third parties of a duty toward that child. Shannon v. Shannon, 150 Wis.2d 434, 444–45, 442 N.W.2d 25 (1989). Second, we disagree with such a narrow concept of duty. The duty of any person is the duty to act with reasonable care. Walker v. Bignell, 100 Wis.2d 256, 263, 301 N.W.2d 447 (1981); A.E. Investment Corp. v. Link Builders, Inc., 62 Wis.2d 479, 483, 214 N.W.2d 764 (1974). 'Thus ... the particular conduct of a defendant is not examined in terms of whether or not there is a duty to do a specific act, but rather whether the conduct satisfied the duty placed upon individuals to exercise that degree of care as would be exercised by a reasonable person under the circumstances.' Walker, 100 Wis.2d at 264 [301 N.W.2d 447.]"

McNeese v. Pier, 174 Wis.2d 624, 630–31, 497 N.W.2d 124 (1993) (finding, inter alia, that a mother who drove her child's schoolmate to school did not breach the duty to exercise reasonable care after the friend was hit by a vehicle while crossing the street to catch her ride). It is eminently logical to expect that teachers, school administrators, day care employees, and other professionals entrusted with the daily care of children will exercise some degree of care in ensuring their well-being and protecting them from harm. A duty clearly exists, whose contours are defined by a reasonable person standard.

 Because there existed a master-servant relationship between the Academy and its administrators and staff during the time in question, any breach of duty by school officials is attributable to the defendant under the doctrine of respondeat superior. The Wisconsin Supreme Court has recognized that

"the distinction between being an 'agent' and a 'servant' is crucial to the determination of whether a principal is vicariously liable. An agent may or may not be a servant and, except under certain obligations, the principal is not vicariously liable for the negligent physical conduct of an agent who is not a servant. However, '[u]nder the doctrine of respondeat superior, a master can be held liable for the physical harm caused to third persons by the torts of his servant.' ..

A 'servant,' as defined by this court, is 'one employed to perform service for another in his affairs and who, with respect to his physical conduct in the performance of the service, is subject to the other's control or right to control.'"

Giese v. Montgomery Ward, Inc., 331 N.W.2d 585, 111 Wis.2d 392, 414–15 (1983) (citations omitted) (emphasis added). There can be little doubt that the teachers and administrators in this case acted as servants on behalf of the defendant; the Academy hired and paid them, set policies and customs regarding their physical conduct in the performance of their duties, and had the right to control their conduct in performing those duties. See generally Wisconsin Civil Pattern Jury Instruction 4030 (Servant: Definition). Moreover, it does not appear that any such employee, other than Mr. Parker himself, was acting outside the scope of his or her employment or serving his or her personal interests. See id. at 4035 (Servant: Scope of Employment). As a result, assuming that the plaintiffs can establish each of

**2.** The language of this provision has changed slightly since the time of the incidents alleged in the complaint.

the four (4) elements in this case, the defendant can be held liable for torts committed by any such employee under the doctrine of *respondeat superior.*

### 2. Breach:

■ "Where the court determines that the facts alleged give rise to a duty, the defendant's failure to exercise the proper standard of care in the performance of that duty must be addressed." *Johnson,* 97 Wis.2d at 542–43, 294 N.W.2d 501. The pattern civil jury instructions for the state of Wisconsin offer the following general definition of the requisite standard of care:

"A person is negligent when he fails to exercise ordinary care. Ordinary care is the degree of care which the great mass of mankind ordinarily exercises under the same or similar circumstances. A person fails to exercise ordinary care when, without intending to do any wrong, he does an act or omits a precaution under circumstances in which a person of ordinary intelligence and prudence ought reasonably to foresee that such act or omission will subject him or his property, or the person or property of another, to an unreasonable risk of injury or damage."

*Wisconsin Civil Pattern Jury Instruction* 1005 (Negligence: Defined). *Accord McNeese v. Pier,* 174 Wis.2d 624, 631, 497 N.W.2d 124 (1993). The question we must answer, then, is whether, based on the facts presented to us when viewed in a light most favorable to the plaintiffs, a jury could find that any the teachers or administrators at the Academy breached their statutory or common law duty to protect John Kendrick from harm by failing to exercise reasonable and ordinary care.

The plaintiffs argue that this duty was breached by Academy officials when they failed to (1) perform a sufficient background check prior to hiring Mr. Parker, (2) adequately supervise Mr. Parker's conduct toward John Kendrick and other students, (3) inform John Kendrick's parents of the Gebhardt incident, and (4) report Mr. Parker to the authorities as required under § 48.981(2). With the exception of the background check, each of these claims presupposes that school officials either knew or should have known of improper conduct by Mr. Parker toward John Kendrick or had reasonable cause to suspect that Mr. Parker posed a risk to students. Could a rational jury find that Academy officials, by not foreseeing an unreasonable risk of possible injury, failed to exercise the degree of "ordinary care" expected from reasonable persons under any of these circumstances?

While the plaintiffs' proof up to this point is far from conclusive, it is our view that a reasonable jury could nevertheless find that school officials breached their duty to protect students by failing to exercise ordinary care in each of these circumstances. As previously indicated, Mr. Hacker does not recall obtaining a resume or job application from Mr. Parker nor contacting Mr. Parker's prior employers or Maranatha, his and Mr. Parker's alma mater, for references or grade reports. Mr. Hacker did talk to John Brazee, Parker's former Pastor at Markesan, but did so only after Mr. Parker had already been employed by the Church; in addition, Mr. Hacker hired Mr. Parker as a teacher in 1983 only after he had affirmed that he would "respect and respond to the authority of the principal." Mr. Parker had also lived with Mr. Hacker and his family from the time he became a volunteer youth pastor for the Church; through this experience, Mr. Hacker no doubt became well-acquainted with Mr. Parker and observed his demeanor around Mr. Hacker's own children.

In sum, Mr. Hacker based his assessment of Mr. Parker's qualifications as a teacher on personal experience and observation as well as one conversation with his former pastor; he did not, however, review any information regarding Mr. Parker's academic record or seek input from previous employers regarding his work experience. Whether a more thorough background check would have revealed any irregularities is a question of proximate cause; for purposes of this analysis, however, we believe that a reasonable jury could find that, when hiring someone who was to supervise and interact with young children, Mr. Hacker did not use ordinary care by failing to adequately investigate Mr. Parker's background.

■ A reasonable jury could similarly find that Academy officials breached their duty to report suspected child abuse under § 48.981(2), as well as their common law duty to protect the students, after conducting the Gebhardt investigation in February of 1984. As previously indicated, § 48.981(2) requires teachers and administrators who have *"reasonable cause to suspect"* that a student has been abused or neglected to report their suspicions to authorities. After investigating the Gebhardt incident on behalf of the Church board, Mr. Hacker determined that wrongdoing by Mr. Parker could not be established because he had appeared to be "looking after the best interest of the child's health" as to the thermometer incident, and because there was no proof that it was Mr. Parker's hand which approached Jon Gebhardt's genital area. Mr. Hacker further stated that he did not initiate an investigation of Mr. Parker's conduct at the Academy or restrict Mr. Parker's activities at the Academy during the investigation because the Gebhardt allegation "revolved around the church, and not the school."

In our view, a jury could reasonably conclude that Mr. Hacker wrongly determined that Mr. Parker's use of a rectal thermometer on the Gebhardt boy was "in the child's best interests." In his defense, Mr. Hacker was not aware of any other allegations of misconduct involving Mr. Parker at the time of the Gebhardt incident; nevertheless, the use of a rectal thermometer on a school-age child, especially by someone other than a parent or a medical professional, clearly raises eyebrows, and seems difficult to justify absent compelling circumstances. And while the allegations regarding Mr. Parker's alleged fondling of the Gebhardt boy may not have been independently substantiated, it nevertheless seems that a reasonable jury could conclude that Mr. Hacker (or a reasonable person in his position) would have had "reasonable cause to suspect," if not believe, that Mr. Parker had committed sexual abuse, and would have been obligated to alert the authorities under § 48.981(2). If this is true, one could also reasonably conclude that Mr. Hacker and Church officials had an obligation to notify the parents of other children in contact with Mr. Parker, including those of John Kendrick, to ascertain whether or not their children had been harmed by similar conduct. For these reasons, and based on the evidence presented thus far, it is our view that a jury could reasonably find that Mr. Hacker failed to use ordinary care in reaching his conclusions and in keeping word of these allegations from the reach of authorities and parents.

A reasonable jury, however, could only conclude that Academy officials failed to adequately supervise Mr. Parker after the date of the Gebhardt incident. As previously indicated, the Academy had a written corporal punishment policy requiring parents to personally administer discipline to their child with a faculty member present. There also, however, apparently existed at the Academy an unwritten policy that corporal punishment could be administered outside the presence of the student's parents but only if another adult was present and a note was sent to the parents explaining what had happened. In addition, while the Academy did not have any written policies or procedures regarding the "counseling" of students outside of the classroom during class time, teachers had authority to remove students from class for the purpose of counseling or to impose punishment; there were apparently no limitations as to when or how long teachers could remove a student from class, and they were not required to report any such instance to administrators.

■ According to the plaintiffs, better supervision by Academy officials may have limited the frequency in which Mr. Parker removed John Kendrick from class and would have minimized any opportunities he might have had to abuse the child or to administer corporal punishment in violation of written and unwritten policy. It is difficult, however, to envision precisely the degree of increased scrutiny which the plaintiffs have in mind. It is not contested that instructors at the Academy could remove students from class for disciplinary purposes, and that there were no written procedures for reporting such incidents to school administrators (unless, of course, corporal punishment was administered); granting teachers the authority to so discipline their students is unquestionably

reasonable and done in nearly every educational setting. During the time Mr. Parker was employed, Mr. Hacker received no complaints as to the improper removal of John Kendrick or any other student from class; indeed, it is not unusual for some students to be reprimanded in this fashion numerous times over the course of a school year.

John Kendrick remembers being removed from class by Mr. Parker approximately ten times; he apparently did not suffer mistreatment in every instance and had likely misbehaved to precipitate at least several such removals. Certainly, this did not grant Mr. Parker a license to abuse; however, it seems clear that, from the perspective of Academy officials, Mr. Parker was administering discipline in the same manner as other instructors. While Mr. Parker could have been abusing his trust during the process, there is absolutely no indication that Mr. Hacker or other school officials were notified or should have been aware that child abuse or any violation of the Academy's corporal punishment policies was occurring.

In order to pursue a claim of negligent supervision in this case, the plaintiffs must show that Academy officials had notice of Mr. Parker's improper conduct with Kendrick or other students. *See, e.g., Mary KK v. Jack LL,* 203 A.D.2d 840, 611 N.Y.S.2d 347, 349 (1994); *Peck v. Siau,* 65 Wash.App. 285, 293, 827 P.2d 1108 (1992); *Kimpton v. New Lisbon School District,* 138 Wis.2d 226, 239–40, 405 N.W.2d 740 (Ct.App.1987). What from the outside appeared to be a normal and common exercise of authority in this case may very well have been something quite different; Academy officials, however, had no reason to suspect Mr. Parker of wrongdoing at any time prior to the Gebhardt incident in February of 1984. After those allegations were raised, one could arguably conclude that Mr. Hacker failed to exercise ordinary care by not limiting Mr. Parker's unsupervised contact with students pending his investigation; prior to that time, however, one could not conclude that Academy officials, with no reason to suspect any wrongdoing, acted unreasonably in their supervision of him. A reasonable jury, then, could only find that Academy officials failed to exercise ordinary care in their supervision of Mr. Parker after the Gebhardt incident, and not before.

### 3. Causation:

■ "There can be no liability predicated upon a breach of duty unless it is determined that such breach was a *legal cause* of the plaintiff's injuries." *Johnson,* 97 Wis.2d at 560, 294 N.W.2d 501 (emphasis added). "Legal cause," in turn, is comprised of two elements; "cause-in-fact" and "proximate cause," or policy considerations. *See, e.g., id.* at 560 n. 20, 294 N.W.2d 501; Keeton, *Prosser and Keeton on the Law of Torts* § 30, at 165 (5th ed. 1984). As to the former:

> "The test of cause-in-fact in Wisconsin is whether the defendant's negligence was a substantial factor in contributing to the harm from which damages are claimed *The phrase 'substantial factor' indicates the effect of the defendant's harm in leading a trier of fact, acting as a reasonable person, to regard it as a cause, using 'cause' in the popular sense.*"

*Johnson,* 97 Wis.2d at 560, 294 N.W.2d 501 (citations omitted) (emphasis added). *Accord Ehlinger v. Sipes,* 155 Wis.2d 1, 12, 454 N.W.2d 754 (1990); *Merco Distrib. Corp. v. Commercial Police Alarm Co.,* 84 Wis.2d 455, 458–59, 267 N.W.2d 652 (1978); Keeton, *Prosser and Keeton on the Law of Torts* § 41, at 264–68; *Restatement (Second) of Torts* § 431, Comment a., p. 429 (1965). While the presence or absence of causation is typically regarded as an "inference to be drawn from the circumstances by the trier of fact," *Johnson,* 97 Wis.2d at 560, 294 N.W.2d 501; *Merco,* 84 Wis.2d at 459, 267 N.W.2d 652; Keeton, *Prosser and Keeton on the Law of Torts* § 41, at 264–65, "[i]t is the function of the court to determine whether the evidence as to the facts makes an issue upon which the jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm to the plaintiff." *Restatement (Second) of Torts* § 434(1)(a) (1965). *Accord Toeller v. Mutual Serv. Casualty Ins. Co.,* 115 Wis.2d 631, 636, 340 N.W.2d 923 (Ct.App.1983);

Keeton, *Prosser and Keeton on the Law of Torts* § 41, at 269.

Even assuming that Academy officials breached their statutory and common law duty to protect students by failing to adequately supervise Mr. Parker while investigating the Gebhardt incident *or* by failing to report the incident to authorities and to the parents of children in contact with Mr. Parker, no reasonable jury could find a cause-in-fact relationship between any such breach and harms suffered by the plaintiffs. Because Mr. Hacker and other administrative officials neither knew nor had reason to suspect that Mr. Parker may have been abusing children prior to the Gebhardt incident, we concluded in the preceding section that the breach of any such duty must have occurred, at the earliest, during February of 1984. Mr. Parker was a teacher at the Academy from fall of 1983 through his agreed "resignation" on April 1, 1984; as a result, any such breach, by definition, could only be deemed a causal factor of abuses suffered by John Kendrick *during the last one and one-half (1½) to two (2) months of Mr. Parker's tenure.* This constitutes less than one-fourth (¼) of his term of employment.

It is our view that the plaintiffs, as a matter of law, cannot meet their burden of establishing a cause-in-fact relationship between a breach of any such duty by the defendant (through its employees) and the plaintiffs' harm because there is no evidence suggesting that Mr. Parker abused John Kendrick during this brief window of time. The plaintiffs acknowledge that John Kendrick cannot recall the specific dates, or even years, of the incidents of abuse alleged in the Complaint; at best, as represented in the plaintiffs' brief, he broadly suggests that these events occurred during "the entire time" that he and Mr. Parker were at the Academy together. This, of course, is an overstatement, as he recalls Mr. Parker removing him from class on approximately ten occasions, and only four instances in which he allegedly suffered physical or sexual abuse; based on statistical evidence alone, then, it is not likely that any such incident occurred during the brief time following any purported breach of duty by Academy offi-

cials. The plaintiffs have presented no other evidence upon which a jury could conclude that Mr. Parker abused John Kendrick subsequent to the Gebhardt allegations; as a result, no reasonable jury could find that any of the above-referenced breaches of duty could have been the cause-in-fact of the plaintiffs' injuries.

The Supreme Court of Wisconsin faced precisely this issue in the *Merco* case. In *Merco,* the defendant, Commercial Police Alarm Company, Inc. ("Commercial"), contracted with the plaintiff, Merco Distributing Corporation ("Merco"), to provide burglar alarm services. *Merco,* 84 Wis.2d at 456, 267 N.W.2d 652. The alarm system installed by Commercial was designed so that, if someone entered any of the doors of the plaintiff's building or crossed through infra-red beams placed inside, it would signal Commercial's office; Commercial would then notify the police and send a representative to the premises. *Id.* at 456–57, 267 N.W.2d 652. Merco, however, was responsible for activating the alarm system at the end of each day after the warehouse was closed and the employees had left. *Id.* As noted by the Court:

"There was testimony that Merco activated the system at 5:00 p.m. on December 4, 1973, and that the equipment at the Merco warehouse indicated that the alarm system was properly set.

However, Commercial did not receive the 'closing signal' from Merco. Commercial's normal procedure when it fails to receive a closing signal is to call the customer's place of business to determine whether the alarm has not been set because someone is working late. If no one answers the call, Commercial then calls the persons on a list provided by the customer to notify the customer that the alarm has not been set.

On December 4, 1973 Commercial called the Merco warehouse at 5:15 p.m. but received no answer. Commercial did not attempt to contact the residences of any of the five or six Merco employees whose names had been given to Commercial. Merco's president testified that Merco had a policy of not leaving the building unattended when the alarm system was not

working, that if he, or another employee, had received a call on December 4th, someone would have gone promptly to the warehouse to reset the alarm, and that if the system were not working, someone would have stayed on the premises until the system was repaired.

At 6:25 p.m. on December 4th, Commercial received notice that the telephone lines which connected Merco's alarm system, as well as those of several other customers, to Commercial's office, were out of order. After learning that the telephone lines were out, Commercial still made no effort to contact Merco employees. Commercial's representatives testified that the telephone line breakdown was the result of two days of steady rain. So many lines were and had been out of order that Commercial's employees were overworked and unable to follow the normal customer notification procedures. There was no evidence as to when the telephone lines were repaired. They were functioning by 8:00 a.m. on December 5th when Commercial received Merco's normal opening signal.

Sometime between 5:00 p.m. December 4th and 8:00 a.m. December 5th, burglars entered Merco's warehouse and took 58 television sets. Commercial received no alarm signal. On December 5th, after the burglary, it was discovered that the alarm wires around a rear fire door had been disconnected on the inside of the warehouse so that entry or exit through that door would not have set off the alarm signal even if the system were functioning properly. There was testimony that on December 3rd, the day before the burglary, someone claiming to be from Commercial worked on the alarm system near the rear fire door. Merco had made no request for service. Although there was no evidence that the infra-red beams had been interfered with, there was testimony that one familiar with their placement could avoid setting off the alarm simply by stepping over them. Tire marks were found outside the fire door the morning following the burglary, supporting the in-

ference that entry had been made through that door."

*Id.* at 457–58, 267 N.W.2d 652.

The trial court entered judgment in favor of Merco and against Commercial, presumably finding the defendant negligent for failing to contact any Merco employees regarding Merco's apparent failure to activate the alarm system. *Id.* at 456, 267 N.W.2d 652. The Supreme Court, however, reversed, and ordered that judgment be entered in favor of Commercial. *Id.* at 461, 267 N.W.2d 652. In doing so, it noted:

*"The question on appeal is whether the evidence is sufficient to support the finding of causation made by the trier of fact.*
. .

In this case we hold that the evidence was insufficient to support the inference that Commercial's negligence was a substantial factor causing the loss suffered by Merco. There is nothing in the record to indicate either when the burglary occurred or when the phone lines were repaired. The trier of fact might conclude that had Commercial followed its usual procedure and notified a Merco employee when Commercial failed to receive a closing signal, a Merco employee might have been on the premises at the appropriate time to thwart the burglary. The burglars might have been dissuaded from attempting to enter or might have been apprehended in the act. Under this supposition, Commercial's negligence was a substantial cause of the loss.

But from the evidence presented, the trier of fact could just as fairly conclude that, even if a Merco employee had been on the premises from soon after the time Commercial notified Merco until the phone lines were repaired, the burglary might have occurred anyway. The burglary could have taken place before the Merco employee arrived or after the employee left. The alarm would not have sounded because the door had been rewired. In this equally possible situation, Commercial's negligence would have no causal connection to the loss.

*The cause of Merco's loss could be attributed to a condition to which no liabili-*

ty attaches or to one for which liability does attach. Because there is no credible evidence upon which the trier of fact can base a reasoned choice between the two possible inferences, any finding of causation would be in the realm of speculation and conjecture. *Rodenkirch v. Johnson,* 9 Wis.2d 245, 248, 101 N.W.2d 83 (1960). 'Speculation and conjecture apply to a choice between liability and nonliability when there is no reasonable basis in the evidence upon which a choice of liability can be made.' *Luke v. Northwestern National Casualty Co.,* 31 Wis.2d 530, 536, 143 N.W.2d 482 (1966), quoted in *United States Fidelity & Guaranty Co. v. Frantl Industries, Inc.,* 72 Wis.2d 478, 489, 241 N.W.2d 421 (1976). *'A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.'* Prosser, *Law of Torts* 241 (4th ed. 1971)."

*Id.* at 459–60, 267 N.W.2d 652 (emphasis added). Because Merco "failed to remove the issue of causation from the realm of speculation" by establishing facts "affording a logical basis" upon which a factfinder could conclude "that the loss occurred [because] Commercial failed to notify Merco that [ ] the alarm system was not functioning," judgment was directed against the plaintiff. *Id.* at 460–61, 267 N.W.2d 652.

With respect to the defendant's failure to more adequately supervise Mr. Parker after February of 1984 or to notify the authorities and parents of students regarding the Gebhardt incident, the plaintiffs in this case, like Merco, have not established facts which would allow a reasonable jury to base a

causation finding on anything other than mere conjecture or speculation. Because John Kendrick cannot recall with any degree of reliability the approximate dates on which he was abused, the factfinder would have no logical basis for concluding that any such incident occurred during the sliver of time in which any such breach of duty by Academy officials could be said to have contributed to the plaintiffs' injuries. At best, it can be said that the Academy could share responsibility for Mr. Parker's conduct during the last 20 to 25 percent of his teaching tenure; coupled with the fact that John Kendrick only recalls being abused four times, the probability that any such incident occurred after February of 1984 is very low, and cannot be ascertained with any degree of reliability. "Because it is impossible to base a judgment on 'conjecture, unproved assumptions, or mere possibilities,'" *Merco,* 84 Wis.2d at 461, 267 N.W.2d 652, we must award summary judgment to the defendant as to each of the above-referenced breaches of duty.

■ The remaining breach of duty which may have been committed by Academy officials, Mr. Hacker's failure to adequately investigate Mr. Parker's background prior to hiring him as a teacher, is similarly flawed. According to the plaintiffs, a reasonable jury could find that this breach of duty was a cause-in-fact of their injuries because Mr. Hacker would not have hired Mr. Parker as a teacher had he more thoroughly checked his academic and work history and discovered that he had been temporarily suspended from Maranatha for acknowledging he had engaged in "homosexual activity." There exists no evidence, however, to indicate what Mr. Hacker would have done had he made this discovery.[3] Importantly, Mr. Hacker

---

3. Mr. Hacker made the following responses to questions posed at his deposition:

Q: What was the purpose of your initial contact with Arnold Weniger?
A: From someplace, I had heard that Kyle had a problem with homosexuality.
Q: And do you remember the place from which you heard that Kyle Parker had a problem with homosexuality?

A: No, I don't.

\* \* \* \* \* \*

Q: But it was this rumor, for lack of a better term, that caused you to contact Arnold Weniger, is that correct?
A: I contacted Larry Oates first.
Q: Okay. Who was Larry Oates?
A: He is a teacher at Maranatha. At that point in time, I believe he was—There's a

was not asked at his deposition whether or not he would have hired Mr. Parker as a teacher at the Academy had he previously obtained this information.

Absent any other information, a factfinder would be left to speculate whether or not a more thorough background check would have even uncovered this information and, if so, whether or not Mr. Hacker would have nevertheless hired Mr. Parker as a teacher. Had Mr. Hacker sought Mr. Parker's academic transcript, it is not clear whether he would have noticed this "gap" in Mr. Parker's attendance record; and even if he had, attempting to determine the explanation Mr. Parker would have given is a matter of pure conjecture. And even assuming that Mr. Parker would have told the truth, or that Mr. Hacker would have contacted Maranatha officials directly, it is not clear what he would have discovered. Had he reached Dr. Weniger or other administrative officers, it appears that he would not have been told of the rumor of Mr. Parker's "homosexual problem," let alone the details of this incident, given their lack of awareness. And because the reason for disciplinary action taken against students is often times not a matter of public record, it is not clear that he would have received any such information even if he had reached Mr. Oates. This is especially true where, as here, Mr. Parker's conduct was not criminal or dangerous to others, and apparently was not considered to be so serious that it precluded his readmission to Maranatha and subsequent graduation.

Of course, even assuming that Mr. Hacker would have become privy to this information had he checked Mr. Parker's academic record, the plaintiffs have provided no proof that Mr. Hacker would have found Mr. Parker unfit for teach at the Academy. As an initial matter, Mr. Hacker was not asked this question at his deposition, and we can only speculate as to his response. In addition, it is important to note that there is no evidence that Mr. Parker had performed unsatisfactorily in any previous jobs or had a substandard academic record; nor is there any indication that Mr. Parker had ever been disciplined by any previous employer or for any other conduct at Maranatha. As previously indicated, given the fact that Maranatha only temporarily dismissed Mr. Parker after his

term that they use. Director of students or something like that.

\* \* \* \* \* \*

Q: What, if anything, did you tell Larry Oates when you contacted him?

A: That I heard that Kyle had had problems with homosexuality and asked him to tell me what he knew about—about Kyle and his problem with homosexuality.

Q: What, if anything, did Larry Oates tell you about Kyle Parker?

A: He told me that prior to that point in time, I do not know exactly what year, Kyle had been a student at Maranatha and he had gone to Michigan for a weekend. During that weekend, Kyle supposedly got involved with some sort of a homosexual activity. He also told me that this was Kyle's admittance or that Kyle brought the story back to Maranatha, that this had actually happened. Kyle evidently felt guilty concerning it and, as a result of that, I believe that Kyle was dismissed from college for a period of time.

Q: Do you know the period of time when Kyle Parker was dismissed from college?

A: No, I don't. I also know that he was readmitted. Larry told me that.

Q: In March 1984, do you know how old Kyle Parker was?

A: Approximately 25.

Q: Did you, during this telephone conference with Larry Oates or during any other conversation with Larry Oates, ever ask him if Kyle's prior homosexual activity involved children or other adults?

A: Your question was, did I ask him?

Q: Yes.

A: I do not recall asking him.

Q: Do you recall whether or not he told you any specific details about Kyle Parker's prior homosexual activity?

A: I don't know specifically—don't remember specifically.

Q: What else, if anything, do you remember about this telephone conference with Larry Oates?

A: I do not remember anything else.

\* \* \* \* \* \*

Q: Did you ever contact anyone other than Larry Oates regarding the allegations about Kyle Parker?

A: Dr. Weniger, the president of the college.

\* \* \* \* \* \*

Q: Do you recall whether or not Dr. Weniger had any knowledge of Kyle Parker's prior homosexual activity?

A: No, I don't.

(Hacker deposition at 198–202.) The record contains no further elaboration of the specific "activities" for which Mr. Parker was suspended from school or the individuals involved.

confession, it appears that his transgression (whatever it was) was deemed a one-time "mistake," and not a permanent character flaw rendering him unfit for accreditation. It, in fact, seems highly unlikely that Mr. Hacker, after observing Mr. Parker's conduct in his home over the past year and with his own children, would have rejected his teaching application based on a single incident which seemed totally out of character.

Finally, and perhaps most importantly, there is a complete lack of evidence in the record regarding any connection between engaging in homosexual activity (whether or not one identifies himself as a homosexual) and pedophilic behavior. There is no evidence in the record to indicate that the incident at Maranatha involved children. Based on this, it seems clear that, had Mr. Hacker learned of this information prior to fall of 1983, he would not have breached a duty of care to protect students had he hired Mr. Parker as a teacher. And if hiring Mr. Parker under such circumstances would not have constituted a breach of duty, then hiring him without the benefit of such information cannot, *a fortiori*, be considered a cause-in-fact of the plaintiffs' harm. Even assuming, then, that a more thorough background check would have uncovered this information, a factfinder would have no logical basis for concluding that, based on issues relating to sexual orientation, Mr. Hacker would have found Mr. Parker to be unfit to teach or an increased risk to children.

This causation issue is similar to that addressed by the Wisconsin Court of Appeals in *Nieuwendorp v. American Family Ins. Co.*, 181 Wis.2d 259, 510 N.W.2d 779 (1993). In *Nieuwendorp*, a child with a history of behavioral problems at school was diagnosed with attention deficit hyperactivity disorder; he began taking medication, and his behavior improved. *Nieuwendorp*, 181 Wis.2d at 262, 510 N.W.2d 779. Because of side effects, however, his parents took him of the drug (Dexedrine) without consulting their doctor or anyone at his school; approximately six months later, his misbehavior had worsened and, in an incident in which he was being removed from class, he pulled his teacher's hair with such force that she fell to the floor,

suffering a herniated disc. *Id.* at 262–64, 510 N.W.2d 779. The teacher sued his parents' insurer, bringing a cause of action for negligence based, in part, on the parents' failure to control their son's behavior by keeping him on medication. *Id.* at 264, 510 N.W.2d 779. The jury verdict found the parents 55% causally negligent for the teacher's injuries, and the insurer appealed. *Id.*

Assuming the propriety of the jury's findings that a parental duty exists to control a child and that a breach of that duty had occurred, the court of appeals nevertheless found that "[no] credible evidence reasonably support[ed]" a finding that the parents' failure to consult a physician or to warn the child's school caused the plaintiff's injuries. *Id.* at 266, 510 N.W.2d 779. Citing *Merco,* the court noted:

"We conclude that the jury could only speculate whether [the child's] further consultation with a physician or warning to the school of the discontinuance of medication would have prevented [the teacher's] injuries ...

*[The plaintiff] suggests that if the school knew [the child] was not on Dexedrine, he would not have been mainstreamed but would have received a different placement. She concludes that [the child] would not have been present to act up in Jacobsen's class on October 6 and that she would not have had to remove him that day. No evidence in the record supports this contention, and the conclusion is purely speculation.*

[The child's] individual education plan did not require, or even mention, [his] use of medication. One of the plan's goals was for [him] to begin, attend and participate regularly in part-time mainstream classes with support from special education staff. As of April 1989, the plan reports [that he] had mastered this objective. This was after he had been taken off Dexedrine. Thus, it was because of his achievements in the 1988–89 school year that he was mainstreamed in the 1989–90 school year. This is supported by his fourth grade teacher's testimony that the decision to mainstream is based on a student's progress. *It is mere speculation that if the school had*

*learned [the child] was not taking Dexedrine, it would have ignored his objectively measured progress toward the mainstreaming goal and refused to mainstream him."*

Id. at 268–69, 510 N.W.2d 779.

For the reasons previously discussed, it would be similarly speculative in this case for a jury to conclude that, had Mr. Hacker learned prior to fall of 1983 that Mr. Parker had been temporarily dismissed from Maranatha for voluntarily admitting that he had on one occasion engaged in unspecified "homosexual activity," a matter totally unrelated to any propensity to harm children, Mr. Hacker would have found him unqualified to teach. In addressing the causation issue, the factfinder, in essence, would be forced to choose from equally possible, yet unsupportable, inferences; under such circumstances, "any finding of causation would be in the realm of speculation and conjecture, [ ] and would be inadequate upon which to base a judgment." *Merco,* 84 Wis.2d at 460–61, 267 N.W.2d 652. Again, the plaintiffs have not established facts providing a logical basis upon which a reasonable jury could conclude that Mr. Hacker's failure to conduct a more complete background check was a cause-in-fact of the plaintiffs' injuries. As a result, we must again award summary judgment to the defendant as to this breach of duty.

4. *Damages:*

There is no dispute that John Kendrick has experienced psychological and emotional problems which, in the opinion of his doctors, resulted from physical and/or sexual abuse as a child. John Kendrick, along with his parents, has no doubt suffered pain and emotional scarring stemming from these problems, as well as incurring medical expenses for hospitalization and treatment. Assuming that these problems could be attributed to a breach of duty by Academy officials, a reasonable jury could clearly find that the plaintiffs have been harmed under the circumstances of this case and set a reasonable damages figure as recompense. As a result, the plaintiffs have met the summary judgment threshold with respect to this issue.

## IV. CONCLUSION

Because the plaintiffs cannot satisfy the causation element necessary to establish a cause of action for negligence, the Court hereby **GRANTS** the defendant's Motion for Summary Judgment pursuant to Rule 56(c), and **ORDERS** that the above-captioned matter be **DISMISSED**.

**SO ORDERED.**